**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joseph C. GALLO; Frederick Graewe; Hartmut Graewe, Kevin Joseph McTaggart; Angelo A. Lonardo, Defendants-Appellants.**

Nos. 83–3288 to 83–3290, 83–3292, 83–3339, 83–3803 and 83–3804.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 8, 1984.

Decided May 29, 1985.

Alan P. Caplan (argued), Cleveland, Ohio, for Joseph C. Gallo and Kevin Joseph McTaggart.

Donna M. Congini, Cleveland, Ohio, William C. Bryson (argued), Washington, D.C., Steven R. Olah, Donna M. Congeni, Gregory B. English, Asst. U.S. Attys., Cleveland, Ohio, for the U.S.

Edward F. Marek (argued), Public Defender, Cleveland, Ohio, for Frederick Graewe.

Paul Mancino, Jr. (argued), Cleveland, Ohio, for Hartmut Graewe.

Leonard W. Yelsky (argued), Cleveland, Ohio, for Angelo Lonardo.

Before MERRITT, WELLFORD and MILBURN, Circuit Judges.

WELLFORD, Circuit Judge.

On appeal from their convictions on Racketeer Influenced and Corrupt Organization Act ("RICO"), Continuing Criminal Enterprise ("CCE"), and related counts, Joseph Gallo, Frederick ("Fritz") Graewe, Hartmut ("Hans") Graewe, Kevin McTaggart, and Angelo Lonardo, raise a total of thirty-five issues in the four appellant briefs filed.[1] There are overlapping issues, however, and we will address how the issues relate to each of the appellants.

Following a jury trial in the United States District Court for the Northern District of Ohio (Manos, J.), the five appellants were convicted on a variety of charges relating to their participation in murder, narcotics distribution, and gambling in the Cleveland, Ohio area. The jury found appellants Gallo, Hans Graewe, and McTaggart guilty of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (count 1). The jury also found those three appellants and Lonardo guilty of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848 (count 2). The jury further found all of the appellants, including Fritz Graewe, guilty of aiding racketeering

---

**1.** Hartmut Graewe filed two briefs written by different lawyers.

We assume the latter of the two superseded the earlier, and therefore have not considered any issue raised in the superseded brief.

through interstate travel, in violation of 18 U.S.C. § 1952 (counts 3 through 21), possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (count 35), and using the telephone to facilitate a narcotics offense, in violation of 21 U.S.C. § 843(b) (counts 40 through 48, 50 through 51, 53 through 55, and 57 through 58).[2]

Gallo, Hans Graewe, McTaggart, and Lonardo all were sentenced to life imprisonment on the continuing criminal enterprise count. In addition, Gallo, Hans Graewe, and McTaggart received concurrent sentences of 20 years' imprisonment on the racketeering conspiracy count. On each of the Travel Act counts, the district court sentenced each appellant to consecutive terms of five years' imprisonment. On the cocaine possession count, the court imposed a consecutive sentence of 15 years' imprisonment on appellants Gallo, Hans Graewe, and McTaggart, and 10 years' imprisonment on appellant Fritz Graewe. For the unlawful use of the telephone counts, the court imposed consecutive four year terms on Gallo, Hans Graewe, McTaggart, and Lonardo; two years' imprisonment on Fritz Graewe.

All five defendants appeal their convictions and the denial of their motions for new trial, which they filed while the appeal was pending.

## I. FACTUAL BACKGROUND

We set out the facts in the light offered by the government and as apparently believed by the jury in reaching its verdicts.

Between 1978 and 1982, appellants and others conspired to control the businesses of gambling[3] and narcotics distribution in the city of Cleveland, Ohio. During that period, they fashioned an agreement between rival criminal factions on the east and west sides of the city, whereby they would jointly control and profit from their control of criminal activities. The evidence indicates that Lonardo was one of the leading directors and investors in the profitable but illicit joint enterprise, that Gallo was a high-level supervisor, and that Hans Graewe, McTaggart, and Fritz Graewe were regular participants in various criminal activities of the enterprise.

The chief witness for the government was Carmen Zagaria, a co-conspirator and coordinator of the enterprise's business activities. He testified in detail about the roles played by defendants and others in narcotics and gambling activities, as well as in violence and intimidation on behalf of the enterprise, which included at least seven murders during the four-year period covered by the indictment. The government called other co-conspirators as witnesses who testified about the criminal activities of the enterprise. The government introduced surveillance evidence and physical and wiretap evidence, which corroborate these witnesses' testimony concerning murders and defendants' roles in gambling and narcotics activities.

In January, 1978, Zagaria started dealing in marijuana. He began with small quantities, buying marijuana in one pound lots

---

**2.** In addition to counts 1 and 2, the jury convicted Gallo on counts 11 through 21 (Travel Act counts), count 35 (the cocaine possession count), and counts 44 through 48, 50, 51, 53, 54, 55, 57, and 58 (unlawful telephone use counts). The jury acquitted him on the remaining counts. The jury convicted Fritz Graewe on counts 16 through 21, count 35, and count 58, and acquitted him on the remaining counts. In addition to counts 1 and 2, the jury convicted Hans Graewe on counts 3 through 21 (Travel Act counts), count 35, and counts 40 through 48, 50, 51, 53, 54, 55, 57, and 58 (unlawful telephone use counts). The jury acquitted him on the remaining counts. In addition to counts 1 and 2, the jury convicted McTaggart on counts 3 through 21, count 35, and counts 40 through 48,

50, 51, 53, 54, 55, 57, and 58, and acquitted him on the remaining counts. In addition to count 2, the jury convicted Lonardo on counts 11 through 21 (Travel Act counts) and on counts 44 through 48, 50, 51, 53, 54, 55, 57, and 58 (unlawful telephone use counts). He was acquitted on the remaining counts.

**3.** The illicit gambling allegations related only to the RICO charge and not to the CCE count. Since Lonardo was not indicted on the RICO charge, his role in the illicit gambling operation may not be considered substantive evidence of criminal activity. The facts concerning these activities, however, are relevant to show the relationships among all the parties.

and selling it by the ounce, utilizing his tropical fish store on Lorain Avenue in Cleveland as a base of operations. Early in 1978, Zagaria met with Keith Ritson,[4] another marijuana dealer; Zagaria and Ritson agreed to cooperate by supplying each other with marijuana as needed. Ritson told Zagaria that McTaggart was selling cocaine and marijuana for him.

In May 1978, Zagaria sought to expand his marijuana business by finding investors for the business and by purchasing large quantities of marijuana in Florida. He agreed with Ritson to obtain marijuana in large lots, from which he would supply a portion of each shipment to Ritson for local distribution.

At about the same time, Hans Graewe told another co-conspirator, James Coppola, that he was looking for a place to invest some money to make a quick profit. Graewe told Coppola that he had succeeded in "ripping off" one Orville Keith for $20,-000 in a narcotics transaction. When Keith realized that he had been "ripped off," he began trying to force Graewe to return his money. Graewe told Coppola that he intended not only to keep the money but also to kill Keith to prevent any further bother about it.[5]

At Coppola's suggestion, Graewe then invested $14,000 of the stolen funds in Zagaria's marijuana business, and Zagaria agreed to pay him $1500 per week on this investment. In addition, Graewe's brother, Fritz Graewe, agreed to sell marijuana for Zagaria. For the next four years, Fritz regularly purchased marijuana from Zagaria's operation for resale; Hans also sold some of Zagaria's marijuana, and he found other drug salesmen for Zagaria's expanding marijuana business.

Several months later, Zagaria repaid $8000 to Hans who said that he was going to buy a farm with the money; in fact, he subsequently acquired a nearby farm. Several months later, Zagaria made another repayment on Graewe's investment by supplying him an ounce of cocaine and an amount of cash. In addition to these payments, Zagaria paid regular installments to Hans as originally agreed.

Between 1974 and 1978, James Coppola worked as the overseer of a Barboot[6] game located on Broadview Road in Cleveland. In that capacity, Coppola testified, he was working for the "west side" group, which included Ritson, Brian O'Donnell, McTaggart, and Danny Greene. The game came to an end in 1978 shortly after Danny Greene was killed in a bombing incident.[7]

In the summer of 1978, Thomas Sinito[8] aproached Coppola and proposed to start a Barboot game that would be jointly sponsored by the rival groups of the east and west sides of Cleveland. Sinito proposed to "split the money and try to stop all this fighting between the east side and the west side." Sinito was a member of the "east side" group, which controlled gambling on the east side of Cleveland.

The representatives of the west side group, including Zagaria, Ritson, and Hans Graewe, agreed to go along with Sinito's proposal to "end all the fighting and have a mutual gambling operation which would benefit both sides of town, keep everybody happy, and split [sic] the profits." Accordingly, Zagaria, Coppola, Hans Graewe, Ritson, and three other men arranged one night to close down the two competing games. They closed the first game without difficulty, and they took over a second

**4.** Ritson was later murdered by Hans Graewe prior to trial.

**5.** Hans Graewe carried out his murderous plan in July 1978. Zagaria agreed to assist.

**6.** Barboot is a dice game in which the players bet against one another and in which the house takes 2½ percent of the winnings as its share.

**7.** The details of the Danny Greene bombing incident are set forth in *United States v. Licavoli,* 725 F.2d 1040 (6th Cir.1984).

**8.** Thomas Sinito was convicted of RICO violations in a separate proceeding. *See United States v. Sinito,* 714 F.2d 143 (6th Cir.1983) (affirming conviction in an unpublished opinion). See also the related cases, *United States v. Sinito,* 723 F.2d 1250 (6th Cir.1983), and *United States v. Sinito,* 750 F.2d 512 (6th Cir.1984).

game, which was then being run in downtown Cleveland. Zagaria and Ritson had sledge hammers with them when the group went to close the competing games, but Coppola told them, "We don't need no sledge hammers. These are all old guys." Coppola let the operator of the second game continue to run the game for the next week in order to try to recoup some of his expenses. He told the man, however, that "next week it is ours."

After Coppola's group took over the downtown Barboot game, the two groups split the profits from the game evenly; in addition, Sinito directed Coppola to give 10 percent of the proceeds to Carmen Basile, the owner of a bar on Cleveland's west side. When Coppola questioned that decision, Sinito replied, "Don't ask questions; just out of respect for the old man, we will give him 10 percent."

In compliance with Sinito's instructions, Coppola began giving Basile 10 percent of the receipts from the Barboot game. Basile, however, regularly charged that he was being cheated, and he and Coppola constantly bickered over the amount of Basile's share. Ultimately, Sinito arranged a meeting to resolve the dispute. Appellant Gallo attended the meeting and told Coppola that Basile was going to supervise Coppola, and that Coppola would be Basile's "underboss." Basile subsequently referred to Gallo and Sinito as "two of my close associates from the east side."

After Coppola, Zagaria, Hans, and their associates took over the Barboot game, Coppola met with Sinito each week to divide up the proceeds from the game. Soon, McTaggart began delivering the "east side's" share of the Barboot money to Sinito. Although McTaggart was not a full partner in the Barboot game, he was regularly given a share of the Barboot receipts.

In August of 1978, Sinito asked Coppola if he knew someone who could handle a "contract" to kill one Harvey Rieger. Sinito said, "We have to get rid of this guy because he knows too much and he is getting ready to go to trial." Coppola then checked with Keith Ritson, who said that

he could handle the contract. Coppola reported Ritson's willingness to perform the contract, and Sinito gave Coppola a $2500 advance to give to Ritson for the job. Ritson, however, made no effort to kill Rieger, and as a result, Coppola had to pay back the $2500 advance that Sinito had given him. Sinito then told Coppola that Ritson had defaulted on the contract, and that Coppola "ought to take care of that situation."

During the same period, Ritson told Zagaria that he wanted to attend a clam bake that was being held by members of the east side group, so that he could "kill a few of his old enemies." In particular, Ritson said he wanted to kill James Licavoli and Angelo Lonardo. At about the same time, Ritson suggested that Hans and Zagaria should kill Sinito, but Zagaria refused.

Zagaria, Coppola, and Hans met on a number of occasions to discuss their problems with Ritson. They suspected that Ritson was an informant and feared retaliation if he tried to kill Sinito. In addition, Hans wanted to eliminate Ritson because he wanted to take over Ritson's share in the Barboot game, and because Ritson had "beat him" in a cocaine deal the previous spring. Ultimately, the three men decided to kill Ritson, and they made plans accordingly.

On November 16, 1978, Ritson was invited to Zagaria's pet store on a pretext. Hans and Zagaria were waiting for him there, and Hans shot and killed Ritson after his arrival. After shooting Ritson, Hans commented, "It looks like I'm back in the Barboot game." Hans then called his brother Fritz to borrow a truck to move Ritson's body. Hans and Zagaria dumped Ritson's body in a local quarry. Hans later told Zagaria that he and his brother Fritz had run a file through the handgun that Hans had used to kill Ritson to avoid identification of the gun as the murder weapon. Coppola assured Sinito that the murder of Ritson had been carried out. Sinito subsequently told Zagaria that he had informed Lonardo that Zagaria was responsible for Ritson's killing. When Zagaria later met

Lonardo at a party, Lonardo told him, "I heard a lot of good things about you," and advised him to "be careful."

In 1979, the conspirators arranged to open a craps game on the west side of town. As in the case of the Barboot game, they agreed to split the proceeds between the west side and east side groups. Zagaria, Hans, McTaggart, and Coppola agreed to take one-half of the game proceeds on behalf of the west side, while Sinito and Gallo agreed to sponsor the game on behalf of the east side.

This new gambling operation was run out of a house in Linndale, Ohio, as arranged by Fritz and others. Gallo arranged for parking in the area with an associate. This game, however, was closed by the police shortly after it began operations.

One of the operators of the game was Billy Bostic, a west side gambler. Bostic made $2500 on the game while it was in operation, but he claimed to have spent a large sum on the improvements to the house. He therefore refused to share the proceeds with the partners in the game. Zagaria subsequently discussed Bostic's actions with Gallo and Sinito, who also recounted problems with Bostic and several of his associates; Gallo commented that "maybe they are getting their little organization bigger than we thought." Several of Bostic's associates from the east side, they said, were making accusations about Licavoli and Lonardo and causing trouble. Sinito and Gallo then told Zagaria that Bostic was "a west side problem" and that Zagaria should "take care of your west side problems ... contact your people and take care of this problem." When Zagaria asked about Bostic's three associates from the east side, Gallo and Sinito said that they would take care of their part of the problem, which was an east side problem. Gallo then said that he would offer $50,000 to anyone on the west side who would kill the three men associated with Bostic.

Zagaria later discussed Bostic with Hans, and in June of 1980, Hans and McTaggart lured Bostic into the basement of Zagaria's pet fish store, where they shot and killed him. At Hans' direction, Fritz then brought Hans his "surgical tools"—a meat cleaver and a large knife—which were used to dismember Bostic's body before disposal of his remains.

Following the failure of the Linndale gambling effort, Zagaria began to suspect that the operators of the Barboot game were cheating him and his partners. With the blessing of Gallo and Sinito, and with the assistance of Hans and McTaggart, Zagaria reorganized and directed the operation of the game. From June 1980 to early 1981, Zagaria ran the game, meeting with McTaggart, Hans, and Coppola on a daily basis, during which period the game was highly profitable. Out of these gambling proceeds, Zagaria paid operating expenses and 10 percent of the gross receipts to Carmen Basile. Remaining profits were divided with representatives of the east side, Gallo and Sinito. In addition, Zagaria regularly gave McTaggart $50 to $100 per week from the Barboot receipts.

In the fall of 1980, Sinito and Gallo asked Zagaria to let an east side representative, Phil Bonadonna, work at the Barboot game. Zagaria and Hans agreed to put Bonadonna to work at the game, if Bonadonna could bring in customers. Basile opposed it, and complained to Lonardo about Bonadonna. Zagaria spoke with Sinito and Lonardo about the matter, and Sinito told Zagaria to "respect Carmen Basile," even though Basile was giving them "a headache over the Barboot game." Lonardo later reiterated this instruction, directing Zagaria to "just respect Carmen Basile and don't pay him no attention and at this time just respect him," but told Zagaria to "keep the kid [Bonadonna] working."

Prior to his death, Ritson told Zagaria that McTaggart was one of his marijuana and cocaine "customers." After Ritson's murder, McTaggart obtained his cocaine and marijuana from Coppola, supplied by Zagaria. Ultimately, McTaggart arranged to obtain his supply of drugs directly from Zagaria, for distribution to his own customers. Zagaria then regularly delivered sub-

stantial quantities of marijuana and cocaine to McTaggart.

As the drug business expanded, Zagaria began to use a crew of assistants to obtain drugs in Florida and to deliver them to Cleveland. One of Zagaria's assistants testified that he began working for Zagaria in the fall of 1978, and that he soon became a regular "runner" for Zagaria, obtaining marijuana and cocaine in Florida and driving the loads back to Cleveland. In November 1978, Zagaria agreed to buy 100,-000 Quaalude (methaqualone) tablets from Sinito, paying $175,000 for them upon resale.

Sinito subsequently arranged to sell bottles of illegally obtained prescription pills to Zagaria for $100 per bottle. The pills included Quaalude and Dilaudid tablets as well as a variety of barbiturates. Zagaria continued purchasing the pills on a regular basis for the next two years. He met with Sinito each week to make satisfactory arrangements.

In February of 1979, Sinito asked Zagaria whether he was interested in purchasing a large amount of marijuana. Sinito then arranged a meeting between Zagaria and appellant Gallo. Following the meeting, Zagaria had one of his assistants pick up the marijuana and deliver it to a "stash house" he operated on the west side of Cleveland. About a week later, Zagaria paid Gallo and Sinito approximately $60,000 for the marijuana thus supplied.

Shortly thereafter, Gallo and Sinito offered to sell a larger quantity of marijuana to Zagaria. Zagaria purchased the marijuana for approximately $225,000. At that time, Gallo and Sinito proposed to Zagaria that they had some "connections" in Florida from who Zagaria could obtain marijuana. Following that discussion, Sinito and Zagaria, together with several of Zagaria's associates, traveled to Florida to buy mari-

juana, but were unable to consummate a deal.[9]

In May of 1979, Gallo and Sinito agreed to invest $25,000 in Zagaria's marijuana business; they agreed that in exchange for their investment, Gallo and Sinito would share in the profits from the venture. That night or the next day, Zagaria sent one of his runners to Florida to purchase marijuana with $35,000 of his own money and the $25,000 Gallo investment. That transaction was followed by a series of marijuana purchases by Zagaria and his associates, using funds provided by Gallo and Sinito. Every week for the next two years, Zagaria met with Gallo and Sinito to discuss their marijuana operations and to divide the profits from this ongoing venture. By August of 1979, Zagaria was paying Sinito and Gallo between $2000 and $2500 per week on their investment. Gallo and Sinito then invested another $25,000 in the venture with Zagaria.

In September 1979, Zagaria sent his assistant, Donn Newman, to Florida on three or four occasions to acquire marijuana. Zagaria would have a runner assistant pick up the marijuana and deliver it to one of his "stash houses." Zagaria would then break the marijuana down into one-pound bags for delivery to his dealers.[10]

In October, Newman took $100,000 to Florida to buy marijuana, but $85,000 of the money was stolen by a drug supplier there. When told, Gallo suggested sending McTaggart to Florida to find and to kill the thief. The stolen money, however, was never recovered, and Zagaria looked to Gallo and Sinito for refinancing the narcotics business. Gallo and Sinito agreed to invest more money in the business, but they explained that while the first $25,000 investment had belonged to them personally, the second $25,000 investment had belonged to "the old timers," indicating (to Zagaria) Lonardo. Since Zagaria was responsible

9. The travel by Sinito and Zagaria in March 1979 formed the basis for the convictions on counts 3 and 4 of the indictment.

10. The travel by Newman and by Zagaria's associate, Ed Uscier, to obtain marijuana and deliv-

er cocaine in September and October of 1979 formed the basis for the convictions on counts 5 through 10 of the indictment. The telephone calls made during those trips formed the basis for the convictions on counts 40 through 43.

for the loss of the $25,000 investment, he was required to pay interest of five percent per week on that money. For their further investment in his marijuana business, they required collateral. The new funds were stolen in a Florida rip-off as well. Zagaria reported the loss to Gallo and Sinito and told them, "We're out of business."

The next month, Zagaria went to a Cleveland restaurant frequented by Lonardo. Inside, Zagaria encountered Sinito and Lonardo, and spoke with Sinito, who indicated that with collateral, Lonardo would lend him $50,000. When Zagaria offered diamonds as collateral, Sinito returned to and consulted Lonardo; by a nod to Zagaria, Lonardo indicated agreement.

Zagaria then was directed to Gallo's office; Gallo told him that Sinito was "next door picking up the money." [11] Shortly thereafter, Sinito arrived carrying $50,000 in a paper bag. Gallo and Sinito explained that a condition of the loan was that a representative of the "east side" would travel to Florida with Zagaria's agent for the marijuana, and would handle the money. Zagaria paid interest of five percent per week on this new loan, in addition to that due on the prior loans, totalling about $5,000 in interest each week, and in addition to a share of the profits earned.

Zagaria began making interest payments to Gallo and Sinito shortly after the new infusion of funds. Between November 1979 and May 1981, he paid them approximately $340,000 in interest alone, and more than $1,000,000 as their share of the profits from the drug distribution operation, all in periodic cash payments. Often Zagaria would be accompanied by his associates, McTaggart and Hans when he made these payments. Zagaria was responsible for buying and selling the marijuana, but Gallo and Sinito provided him with marijuana suppliers in Florida and dealers in the

Cleveland area. Zagaria followed the procedure of sending a "runner" to Florida to purchase the marijuana, accompanied by an "east side" representative on the trip.

Zagaria would arrange to pick up the marijuana and place it in a "stash house," where it would be weighed and packaged for distribution to the local dealers. Zagaria had as many as 30 runners working for him on various marijuana trips, each paid about $1,000 per trip.

Gallo was monitored in a phone conversation in December, 1980 with an associate. Gallo discussed selling 1,000 pounds of high-quality marijuana, which "we can pick up in Miami." In the same conversation, Gallo commented that "We need a landing strip of about 6500 feet to import a load of about 12,000 pounds." Zagaria, Gallo, and Sinito did not limit themselves to marijuana dealing; in addition, Zagaria paid Sinito between $90,000 and $100,000 for prescription items. He also paid Sinito and Gallo some $200,000 for Quaalude tablets and over $150,000 for cocaine.

In January of 1980, Zagaria traveled to Florida to try to reclaim some of the money that had been stolen from his drug runners. Gallo and Sinito donated Ronnie Anselmo, one of their associates, to serve as "muscle" for Zagaria's efforts. Although Zagaria failed to get the money back, he was able to arrange additional large shipments of marijuana, both from Florida and from Atlanta, Georgia. [12]

Early in 1980, Zagaria, Gallo, and Sinito flew to Jamaica and contacted a pilot who could fly marijuana into the United States. In addition, they arranged for access to an airstrip at which both marijuana and cocaine could be imported. Zagaria arranged to use an airstrip in Tennessee, where he said the local sheriff "was on our side," adding "we could pay him and land a plane

---

**11.** The evidence showed that the restaurant frequented by Lonardo was located very close to Gallo's office.

**12.** The travel by Zagaria and his associates, Anselmo and Odom, to Florida and Georgia in January 1980 formed the basis of the convictions on counts 11 through 14. The telephone

calls between Zagaria, Gallo, and Sinito during that trip formed the basis for the convictions on count 44. The travel by runner William Laszlo to Georgia in May 1980 to pick up 750 pounds of marijuana formed the basis for the convictions on count 15.

there just about any time we wanted." In September of 1980, one of Zagaria's runners had possession of a rental car used on one of the drug supply trips. Because the car had not been returned to the rental agency, the police seized the car and discovered that it contained narcotics, paraphernalia, and cocaine.[13]

McTaggart, who continued to obtain large amounts of marijuana and cocaine from Zagaria, had a number of dealers who worked under him, and whom he contacted on an almost daily basis. A McTaggart associate testified at trial that McTaggart regularly supplied cocaine and barbiturates to members of the Hell's Angeles motorcycle group. Timothy Lindow, a McTaggart dealer, testified that he was looking for work when he got out of prison in early 1979, and that he had asked Coppola about any prospects. Coppola referred him to McTaggart, who agreed to let Lindow sell cocaine and Quaaludes for him. Lindow obtained cocaine and Quaaludes from McTaggart regularly until January 1980, when he was jailed for burglary. During the summer of 1979, however, McTaggart and Hans complained to Zagaria that Lindow owed money for drugs purchased and advised Zagaria they had to "put a little pressure" on Lindow.

After Lindow's release from jail in 1980, Hans and McTaggart met with him, not knowing that Lindow had agreed to cooperate with the FBI. Although Lindow did not tell them about his FBI relationship, McTaggart nonetheless searched Lindow for a hidden recording device when they met, and threatened him by a reminder about "what would happen to people like Keith Ritson." Hans added to those threats by reference to Lindow's wife and children.

Allan Wysocki, involved with William Laszlo, one of Zagaria's dealers in cocaine, was arrested without having paid Laszlo. When released in December 1980, Wyoscki was visited by Laszlo along with Hans.

Laszlo demanded that Wysocki pay the cocaine debt. When Wysocki said he did not have the money, Hans informed Wysocki that he "definitely wouldn't be walking around the next day" if he failed to find it. In addition to his services as an "enforcer," Hans also recruited drug dealers for Zagaria's operation, including in 1978, Larry Turner operator of a Zagaria "drug house." Hans introduced Zagaria to Gary Young, who became a substantial marijuana dealer for Zagaria.

Like McTaggart, Hans also had frequent conversations with Zagaria concerning drug customers. For instance, Hans and McTaggart spoke to Zagaria about allowing a barmaid named "Utah" to purchase marijuana; Hans subsequently advised Zagaria about another customer who would purchase small amounts of marijuana and LSD.

Gallo and Sinito asked Zagaria in late 1979 if he were interested in joining "the Mafia." Gallo and Sinito then described the organization of the group; that the head of the local Mafia had admitted no new members for 15 years, except themselves. Zagaria said that he had learned Basile was a "made member" of the Mafia, and that other members in Cleveland were Licavoli, the "boss"; Lonardo the underboss; Gallo and Sinito; Anthony Liberatore; and a sixth member then living in Florida. Basile had said he was the controller of the west side Mafia family, sponsored by Lonardo with respect to his 10 percent interest in the Barboot gambling. When Zagaria mentioned Lonardo's name, Sinito and Gallo warned against ever using the name, but rather suggested that he refer to Lonardo and Licavoli as "the old-timers, the other guys, the old men, anything but their names." In the fall of 1980, Gallo and Sinito spoke with Zagaria once again about joining the Mafia; Sinito intended to take Lonardo's place, and they promised Zagaria that he would be put in charge of all the "soldiers."

---

**13.** The cocaine that was found in the rental car formed the basis for the convictions on count 35 of the indictment.

Curtis Conley was a competing cocaine distributor, resisting McTaggart's and Hans' pressures to join them. In April 1980, Ronnie Starks, a cocaine dealer for McTaggart and Zagaria reported that Conley wanted to kill them both. In June, Gallo told McTaggart about a contract on his life; at that point Zagaria and McTaggart decided to confront this serious threat. They pretended to purchase cocaine from Conley, but instead shot him to death and stole a pound of cocaine Conley then possessed. Zagaria advised Hans and Gallo about Conley's elimination.

Zagaria also learned that another competitor, David Hardwicke, was trying to sell a kilogram of cocaine in the Cleveland area.[14] Zagaria had dealt previously with Hardwicke. Zagaria and his associates decided to steal the kilogram. At a meeting with the Graewes and McTaggart, Fritz suggested choking Hardwicke with a coathanger. Zagaria agreed to share the proceeds from the sale of the stolen cocaine. The conspirators, under the pretext of purchasing the cocaine, lured Hardwicke into a car where Fritz strangled him with a coathanger, and the Graewes and McTaggart shot him. Zagaria took Hardwicke's cocaine and sold it; he later shared the proceeds with each of the murder participants, as agreed. One of Hardwicke's former partners subsequently gave Zagaria a $5,000 discount on a kilogram of cocaine for his service in disposing of Hardwicke.

In November of 1980, one of Zagaria's associates suggested stealing two kilograms of cocaine from Kenny Odom, suspected of a previous substantial theft from Zagaria's organization. Zagaria talked with Hans and McTaggart about this proposal, and they agreed. Fritz and Robert Dumas, another of their associates, would pose as narcotics officers, and would then steal the cocaine in the course of a pretended arrest. McTaggart, Zagaria, and Hans supported Fritz and Dumas at the scene of the subsequent theft. Zagaria paid each of the participants a substantial sum for their efforts in eliminating Odom.[15]

In September 1980, Sinito and Gallo discussed with Zagaria another proposal to steal drugs from a principal supplier, Joseph Giaimo. Zagaria did not initially agree to go along with the plan since Giaimo was supplying large amounts of marijuana, cocaine and Quaaludes for him. Later Gallo and Sinito again discussed with Zagaria "ripping off" Giaimo. They finally agreed to steal a huge quantity of drugs from Giaimo and to kill him in the process. Accordingly, they arranged a marijuana purchase from Giaimo to occur at about the end of the year. They then sent a number of people to Florida to pick up a load of Giaimo's marijuana. On the first trip, the runners returned from Florida with almost 800 pounds of marijuana.

Gallo and Sinito told Zagaria that from the proceeds of the sale of Giaimo's drugs, Zagaria would be able to pay the entire $124,500 that he still owed to the two "old timers" and would be able to make an additional profit on the transaction. Zagaria contacted Hans and explained the plan to him. On the night of January 17, 1981, Zagaria and Hans lured Giaimo into Zagaria's pet fish store and killed him, bricking the body into a basement wall.[16]

The Giaimo theft enabled the conspirators to obtain marijuana worth more than $500,000, which was shared by the principal participants, including Zagaria, Sinito, Gallo, McTaggart, and the Graewes. Zagaria stored some of the marijuana at Fritz's home until it could be distributed.[17]

14. Zagaria knew him only as "David," but the man was later identified as David Hardwicke.

15. The travel of Ed Uscier from Florida to Ohio in November 1980 with the two stolen kilograms of cocaine formed the basis for the convictions on count 16.

16. The plans to "rip off" Giaimo were discussed in several telephone conversations between Za-

garia, Gallo, and Sinito, intercepted pursuant to court order. Those recorded conversations included discussions of other narcotics transactions and gambling activities.

17. The travel of Fritz Graewe and three of Zagaria's other associates in connection with the Giaimo "rip off" formed the basis for the convictions on counts 17 through 21. The related

In December 1980, Sinito asked Zagaria if he "had room in the pond to put someone," referring to one of Zagaria's drug dealers, David Perrier, who was challenging Lonardo and Licavoli. According to Sinito, Perrier was claiming that he had "buried a lot of people for Lonardo and Licavoli" and wanted payment. Later the same month, Zagaria saw Sinito and Lonardo together at the same restaurant. Sinito approached Zagaria, recounted the problems with Perrier, and asked if Zagaria would help. Sinito told Zagaria that Lonardo was so angry at Perrier that he wanted to kill him personally. In response, Zagaria replied that he would help. Sinito returned to Lonardo, who then nodded to Zagaria. Sinito later reported to Zagaria that with the assistance of an east side "muscle" man, he had killed Perrier.

In February 1981, Zagaria met with Basile, who indicated he would tell Lonardo what good work Zagaria had been doing; "you should become a member, and Angelo would be proud." Lonardo later congratulated Zagaria personally for his services; he told Zagaria, "I heard a lot of good things about you. You are doing a good job, and be careful." [18] Later that spring, Gallo again talked with Zagaria about joining the Mafia. If Gallo and Sinito were to be "bosses", when Zagaria joined, he would be an "underboss." Zagaria later told Hans about this conversation; Hans replied that Zagaria should join the group to learn "where everything is coming from."

On May 12, 1981, law enforcement authorities conducted warrant-authorized searches of Zagaria's premises and those of several of his associates. Narcotics, drug paraphernalia, and firearms were discovered at several of the locations, including the residences of Zagaria and the Graewes. Subsequently, Zagaria transferred the day-to-day responsibility for running the drug business to Donn Newman. In August of 1981, Zagaria attended a party for Basile, at which Lonardo was present. Lonardo asked Zagaria how McTaggart was doing.

In addition, he informed Zagaria to be careful, and not to wear so much jewelry in public. Sinito later told Zagaria that Lonardo had complained about his wearing too much jewelry. In late 1981, during the course of the FBI investigation of the defendants, Hans told one of his associates about his plan to kill two investigating FBI agents. The FBI was also informed that Zagaria was threatening the agents' lives. FBI agents subsequently interviewed Lonardo concerning those reported threats, and Lonardo told them "we wouldn't want that kind of headache."

Cleveland police officers conducted regular surveillance of several defendants for over two years during the pertinent period. Surveillance indicated that Lonardo met with Sinito on a daily basis at regular meeting places. Sinito and Gallo also met regularly, and Gallo joined Lonardo and Sinito at their meetings approximately once each week. Telephone records showed a huge volume of calls between telephones listed to Sinito and those listed to Zagaria, Gallo, and McTaggart. There were also large numbers of calls reflected between Zagaria and McTaggart, and between Hans and Zagaria, Fritz, and McTaggart. (The records indicated calls made to and from numbers attributed to the defendants above indicated).

Only Gallo, among appellants, testified and he admitted being aware of Zagaria's narcotics operation, but denied participation in it. He claimed that his dealings with Zagaria involved gems and jewelry. Gallo explained that the comments about marijuana in the tape-recorded conversations referred to his effort to obtain marijuana for a friend who needed it for medicinal purposes.

Fritz offered evidence of witnesses that he held several jobs during the indictment period, and that he had no appreciable sum in his savings account during the time. Hans produced witnesses to discredit the Coast Guard reports regarding the Orville

---

telephone calls during that period formed the basis for the convictions on counts 57 and 58.

**18.** This is the second occasion on which Lonardo congratulated Zagaria in a similar manner.

Keith incident. Lonardo called several witnesses who testified that Lonardo ate five days a week at a local restaurant that was the scene of the meetings about which Zagaria testified. They claimed they had never heard Lonardo discuss drugs, loansharking, or gambling while he was in the restaurant, and said that Lonardo was not present on several of the occasions to which Zagaria referred. McTaggart's father testified that he was visiting with his son in the hospital on the day Conley was killed.

## II. DISCUSSION

The five appellants herein raise over thirty issues, which they claim require reversal of their convictions. There is considerable overlap among appellants' claims, and for clarity's sake we will discuss the issues topically making reference as necessary to the facts pertaining individually to appellants' arguments.

## A. SUFFICIENCY OF THE EVIDENCE

■ Each appellant raises the issue of whether the government adduced sufficient evidence to support his conviction. In addressing the sufficiency of the evidence, this Court does not sit as a trier of fact in a *de novo* trial. Rather, the standard of review for claims of insufficient evidence is:

> whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see also United States v. Chagra*, 669 F.2d 241 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982). As the Supreme Court has stated: "It is for [jurors] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *United States v. Bailey*, 444 U.S. 394, 414–15, 100 S.Ct. 624, 636–37, 62 L.Ed.2d 575 (1980); *United States v. Chagra*, 669 F.2d 241, 257 (5th

Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982). Furthermore, "[c]ircumstantial evidence is entitled to the same weight as direct evidence in this calculus [of determining sufficiency]." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954). And, the uncorroborated testimony of an accomplice may support a conviction under federal law. *See Krulewitch v. United States*, 336 U.S. 440, 454, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring); *United States v. McCallie*, 554 F.2d 770, 771–72 (6th Cir.1977); *United States v. Ailstock*, 546 F.2d 1285, 1287–88 (6th Cir.1976). We find each appellant's contention of insufficient evidence of guilt to be without foundation.

### 1. *Lonardo*

■ Count 2 of the grand jury's indictment in relevant part alleged that Lonardo:

> did engage in a Continuing Criminal Enterprise in that [he] did violate Title 21, United States Code, Section 841(a)(1) [distribution of Schedule I and II controlled substances].... Section 843(b) [illegal use of telephone] ... which violations were part of a continuing series of violations of said statutes undertaken by the said defendants in concert with at least five other persons, with respect to whom [Lonardo] occupied a position of organizer, supervisor, and manager....

> It was a further part of the conspiracy that the defendants, co-conspirators, would traffic in illegal drugs on a daily basis.... Moreover, ALL DEFENDANTS supervised an operation pursuant to which legal prescription drugs ... were diverted to the clandestine market....

> 2. ANGELO LONARDO was a "Boss" in the Cleveland Organized Crime Family, would supervise the efforts of his two trusted subordinates, THOMAS SINITO and JOSEPH GALLO, in said narcotics enterprise conspiracy. These three also filled the roles of financiers and protectors of the enterprise from encroachment by other competing criminal groups. JOSEPH GALLO and

THOMAS SINITO would strive to insulate ANGELO LONARDO from criminal liability by serving as the conduit through which his instructions were relayed to the other members of the conspiracy.

The central focus was Lonardo's involvement in drug trafficking; in particular, his role as supervisor, protector, and, financier of the drug operation. Lonardo emphasizes his contention that the evidence, while perhaps indicating involvement in loan sharking and illegal gambling, does not support his involvement in the illicit drug traffic.

Evidence in the record, however, does support the government's position that Lonardo was indeed a financier of Zagaria's drug operations. In May of 1979, Zagaria received $25,000 from Joe Gallo and Tommy Sinito as an investment in his drug business. In August they invested another $25,000. In mid-October Zagaria's courier in Florida had nearly $100,000 stolen by a drug supplier. When Zagaria went back to Sinito and Gallo, they informed him that the initial investment had been theirs, but the second investment had been borrowed from Lonardo. Zagaria borrowed an additional $24,500 from Gallo and Sinito; when he received the money he also received a "payment book" to reflect the weekly interest charged. Zagaria's drug supplier in Florida again stole this money and Zagaria told Sinito and Gallo that "we're out of business."

Sinito responded that if he could come up with collateral, the "old-timers" [19] would be willing to loan an additional $50,000 with "different specifications." After Sinito informed Zagaria of this, during their meeting at a local restaurant, Sinito immediately conferred with Lonardo, also present at the restaurant. After Sinito conferred with Lonardo, he told Zagaria that "they agree, just come up with more collateral, and you will have the money," Lonardo nodded to Zagaria in affirmance.

A few days later Gallo informed Zagaria that "Our buddy [Sinito] was next door [20] picking up the money." Sinito and Gallo gave Zagaria $50,000 but said that an "east side man" [21] would have to accompany Zagaria's man on his trips to Florida. When Zagaria made payments to Sinito and Gallo, he placed them in two bags, one for the "interest" and one for a share of the "profits." Since "specifications" for the loan required the presence of an "east side man," a jury reasonably may have concluded from these circumstances that Lonardo was the genesis of the "specifications" and the financier of the drug enterprise.

The evidence also indicates that Lonardo was the supervisor of Sinito, clearly implicated in the drug conspiracy. There was more than mere guilt by association (*see United States v. Tolliver*, 541 F.2d 958, 962 (2d Cir.1976), and *Ong Way Jong v. United States*, 245 F.2d 392 (9th Cir.1957)); the evidence forms the basis for a reasonable jury's conclusion that Sinito's actions were, in fact, orchestrated by Lonardo, and was therefore a valid basis for the CCE count conviction.

The *Pinkerton* doctrine set out in 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), makes each member of a conspiracy responsible for acts in furtherance of the conspiracy committed by his co-conspirators, and therefore considerably hurts Lonardo's sufficiency argument.[22] The court

---

**19.** Testimony indicates or clearly implied that the "old-timers" included Lonardo.

**20.** The evidence indicates that Gallo's office was near the restaurant frequented by Lonardo.

**21.** Lonardo was of top rank under the evidence in the east side crime family. Keith Ritson [a murder victim], for example, wanted to go to the east side's annual clambake and kill a few of his old enemies: "James Licavoli, Angelo Lonardo, Eugene Ciasuelo, and Calabrese." There is

copious other evidence further showing Lonardo's supervisory and managerial role in the east side crime family.

**22.** The Eleventh Circuit in *United States v. Alvarez*, 755 F.2d 830, 849–50 (11th Cir.1985), noted that a "court need not inquire into the individual culpability of a particular conspirator, so long as the substantive crime was a reasonably foreseeable consequence of the conspiracy." We agree with this characterization of the *Pinkerton* doctrine.

here properly instructed the jury on the theory urged by the government, *See United States v. Murray,* 492 F.2d 178, 187 (9th Cir.1973), *cert. denied,* 419 U.S. 942, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974), *citing United States v. Rosselli,* 432 F.2d 879 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).[23] Since copious evidence against the other co-conspirators exists that shows their involvement in the CCE and in the underlying substantive offenses, the evidence only need show that Lonardo was also a member of the CCE conspiracy, and it was sufficient for that purpose:

> while no direct evidence or formal agreement is necessary to establish a conspiracy ... there must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew it, and with that knowledge intentionally joined that conspiracy.

*United States v. Bright,* 550 F.2d 240, 241–42 (5th Cir.1977). There was sufficient evidence, giving favorable construction to the government's proof, to satisfy this criterion.

The evidence supports circumstantially that Lonardo was a co-conspirator in the drug operation, and that he was a chief financier. Lonardo, on two separate occasions contributed significant sums of money to the drug operation.[24] After Zagaria had been defrauded of nearly $100,000 in a drug deal; moreover, he met with Sinito in Lonardo's presence, and Sinito said the "old timers" would be willing to lend $50,000 as long as one of their own trusted men was present during any drug purchase, evidencing Lonardo's actual knowl-

edge of Zagaria's illicit drug business. In sum, there is sufficient evidence from which a jury could find that Lonardo was a knowing financier and co-conspirator in the CCE.

Lonardo claims, however, that his single act of investing money in the drug operation is insufficient to make him part of the CCE. There is evidence, on the other hand, that Lonardo committed more than a single act in furtherance of the conspiracy, although the one "loan" to the drug operation would be sufficient to make him part of the CCE. We recognize that:

> For a single act to be sufficient to draw an actor within the ambit of a conspiracy to violate the federal narcotics laws, there must be independent evidence tending to prove that the defendant in question had some knowledge of the broader conspiracy, or the single act must be one from which such knowledge may be inferred.

*United States v. Sperling,* 506 F.2d 1323, 1342 (2d Cir.1974), *quoting United States v. DeNoia,* 451 F.2d 979, 981 (2d Cir.1971). The single act in the instant case, however, is one from which knowledge of a broader conspiracy properly may well be inferred. Lonardo invested substantially in the drug enterprise, and he made the loan contingent upon one of his group's men accompanying Zagaria's man on his shopping expeditions. A network of dealers would reasonably be deemed necessary to dispose of Lonardo's investment alone in illicit drugs. This single act of investing a considerable sum of money in the drug operation is therefore sufficient to prove that Lonardo was a member of the conspiracy. The

**23.** There is no requirement that the court use the word "Pinkerton" in its charge to the jury. The court here gave this instruction:

> [if] the defendant under consideration was · one of [the conspiracy's] members, then the statements and acts knowingly made and done during such conspiracy and in furtherance of its objects, by any other proven member of the conspiracy, may be considered by the jury as evidence against the defendant under consideration even though he was not present to hear the statement made or the act done.

> This is true because, as stated earlier, a conspiracy is a kind of partnership so that under the law each member is an agent or partner of every other member, and each member is bound by or responsible for the acts and statements of every other member made in pursuance of their unlawful scheme. Jt.App. at 3259. This comports with *Pinkerton.*

**24.** Although he emphasizes that he made *loans* to, rather than *investments* in, the drug business, Lonardo never claims he did not know of Zagaria's intended use for the money.

*Pinkerton* doctrine helps close any gaps in the proof of Lonardo's involvement in other substantive offenses.

In *United States v. Alsobrook*, 620 F.2d 139, 143–44 (6th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980), we held that a jury must find that a defendant was aware of the interstate travel which provides federal jurisdiction under the Travel Act, 18 U.S.C. § 1952.[25] *See also United States v. Prince*, 529 F.2d 1108, 1111–12 (6th Cir.), *cert. denied*, 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976); *United States v. Barnes*, 383 F.2d 287 (6th Cir.1967). That Lonardo required an east side man to accompany Zagaria's courier to Florida to pick up his marijuana shipments, sufficiently evidences Lonardo's awareness of the interstate travel involved in the CCE.

Lonardo relies also upon what is known as the "innocent purposes doctrine" in respect to the conspiracy charge. "To establish the intent essential to a conviction for conspiracy the evidence of knowledge must be clear and not equivocal. A suspicion, however strong, is not proof and will not serve in lieu of proof." *United States v. Gutierrez*, 559 F.2d 1278 (5th Cir.1977), quoting *United States v. Pruett*, 551 F.2d 1365 (5th Cir.1977). In *Gutierrez*, $500 of marked money from a government purchase of drugs was found at the residence of the primary defendant's uncle. The court determined that the mere presence of

the money, without more, was insufficient to prove a conspiracy between the uncle and nephew because completely innocent actions could have resulted in the presence of the money. The court, therefore, reversed the uncle's conviction. *See also United States v. Leon*, 534 F.2d 667 (6th Cir.1976).

Lonardo argues that the evidence adduced against him is consistent with "innocent" behavior. Lonardo's requiring his own trusted men to accompany Zagaria's drug couriers as a condition to his making a substantial loan in the drug enterprise indicates more than innocent behavior with respect to the investment (or loan as the case may be). Sufficient evidence, therefore, supports Lonardo's conviction on all substantive counts.

## 2. *Fritz Graewe*

 Fritz also claims that sufficient evidence does not exist to support his conviction on counts 16, 17, 18, and 19 (Travel Act counts),[26] count 35 (possession of cocaine with intent to distribute), and count 58 (use of a telephone to facilitate distribution of marijuana).

Even under this court's narrow construction of the Travel Act in *United States v. Alsobrook*, 620 F.2d 139, 143–44 (6th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980) (*but see supra* note 25),

---

**25.** This court is alone in requiring knowledge of the interstate nexus as a necessary element in the proof of a Travel Act violation. *See United States v. Herrera*, 584 F.2d 1137, 1150 (2d Cir. 1978); *United States v. LeFaivre*, 507 F.2d 1288, 1297–98 (4th Cir.1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); *United States v. Perrin*, 580 F.2d 730, 737 (5th Cir. 1978), *aff'd*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); *United States v. McPartlin*, 595 F.2d 1321, 1361 (7th Cir.1979), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1980); *United States v. Sellaro*, 514 F.2d 114, 120–21 (8th Cir.1973), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); *United States v. Roselli*, 432 F.2d 879, 891 (9th Cir.1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971); *United States v. Villano*, 529 F.2d 1046, 1054 (10th Cir.), *cert. denied*, 429 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976).

In *United States v. Yermian*, —— U.S. ——, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), the Supreme Court indicated that knowledge is not necessary to confer jurisdiction under the federal false statement statute, 18 U.S.C. § 1001. *Id.* at 4923 (existence of fact conferring federal jurisdiction "need not be one in the mind of the actor at the time he perpetrated the act made criminal by the federal statute.") This holding may suggest that the basis of the knowledge requirement under the Travel Act may no longer be valid. We need not reach this question, however, because we find sufficient evidence from which a jury reasonably could have found that Lonardo was aware of the interstate travel involved in the conspiracy.

**26.** Graewe does not challenge the sufficiency of the evidence with respect to counts 20 and 21, which charge him with being the person who actually did the interstate traveling.

there is sufficient evidence supporting Fritz's conviction on the Travel Act counts. It is not necessary for a co-conspirator to know the circumstances of each instance of travel or the identity of each traveler-participant in a criminal activity. *See United States v. Prince*, 529 F.2d 1108 (6th Cir.), cert. denied, 429 U.S. 838, 97 S.Ct. 108, 50 L.Ed.2d 105 (1976). The evidence shows that Fritz actually participated in the interstate travel on at least two occasions, that he was a regular distributor in the narcotics operation, and that he played a very substantial role as a protector and enforcer of the enterprise. His claims of insufficient proof to sustain the Travel Act convictions are without merit. The *Pinkerton* theory of co-conspirator liability, moreover, sufficiently supports Fritz's conviction on the remaining substantive counts.

3. *Hans Graewe, Joseph Gallo, and Kevin McTaggart*

We also find the contentions of Hans Graewe, Gallo and McTaggart as to sufficiency of the evidence to be without merit because of the substantial evidence in the record supporting their convictions on all counts.

**B. THE SPEEDY TRIAL ACT'S THIRTY DAY REQUIREMENT**

All appellants and Zagaria were initially indicted on July 8, 1981. Subsequently, Zagaria agreed to enter a plea bargain arrangement and to testify against his alleged co-conspirators. Thereafter, a superseding indictment was returned on October 27, 1981, which changed Zagaria's status from indicted to unindicted co-conspirator, added Gallo to the RICO count (Count 1), and *withdrew* the predicate offense charging Hans Graewe with the murder of one Ted Waite.

Appellants were arraigned on the superseding indictment on October 28, 1982.[27] The original indictment was dismissed the next day on the government's motion, jury selection began November 8, 1982, and the trial began a week later. Gallo and Hans Graewe each claim the court committed reversible error by failing to grant a 30-day continuance following the superseding indictment. They claim the Federal Speedy Trial Act, 18 U.S.C. §§ 3161(c)(2)[28] and 3161(d)(1)[29] require a new 30 day period after the superseding indictment.

1. *Joseph Gallo*

■■■■ The original indictment charged Gallo with engaging in a Continuing Criminal Enterprise, 21 U.S.C. § 848, and numerous substantive violations. The superseding indictment, in addition to these counts, also charged Gallo with RICO violations, 18 U.S.C. §§ 1961–1968.

We note at the outset that the Speedy Trial Act requires a court to provide an additional 30-day period in two situations only. First, when "any indictment or information is dismissed *upon motion of the*

---

27. Fritz filed a motion for continuance on November 3, 1982, denied November 5, 1982. Gallo moved for a continuance on November 1, 1982, denied November 3, 1982. We find no indication in the record that other appellants moved for continuance, as claimed by Hans in his brief. We assume for purposes of this appeal, however, that each appellant timely moved for a continuance and was turned down, since the government does not argue to the contrary.

28. 18 U.S.C. § 3161(c)(2) provides:
 Unless the defendants consent in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.

29. U.S.C. § 3161(d)(1) provides:

If any indictment or information is dismissed upon motion of the defendant, or any charge contained in a complaint filed against an individual is dismissed or otherwise dropped, and thereafter a complaint is filed against such defendant or individual charging him with the same offense or an offense based on the same conduct or arising from the same criminal episode, or an information or indictment is filed charging such defendant with the same offense or an offense based on the same conduct or arising from the same criminal episode, the provisions of subsections (b) and (c) of this section shall be applicable with respect to such subsequent complaint, indictment, or information, as the case may be.

*defendant*," and second, when "any charge contained in a *complaint* filed against an individual is dismissed or otherwise dropped." (Emphasis added). Here the indictment was dismissed upon the *government's* motion, not upon defendants' motion. Further, an indictment, not a *complaint* was dismissed.[30] Therefore both provisions are inapplicable. We note also that the original indictment was not dismissed until after the defendants had been arraigned under the superseding indictment. Section 3161(d)(2) is limited to situations in which a new indictment, information, or complaint is filed *after* dismissal of the original indictment. Section 3161(d)(2) is therefore inapplicable to the circumstances of this case. We agree with the Second and Seventh Circuits that the appropriate period for preparation by defendants following a *superseding* indictment is governed by the discretion of the district court, and not by the statutory 30-day requirement. *See United States v. Todisio*, 667 F.2d 255, 260 (2d Cir.1981), *cert. denied*, 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982), and *United States v. Horton*, 676 F.2d 1165, 1170 (7th Cir.1982), *cert. denied*, 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983); *see also* Committee on the Administration of the Criminal Law of the Judicial Conference of the United States, *Guidelines to the Administration of the Speedy Trial Act oif 1979* (1981) at 14

(30-day period does not run anew when a superseding indictment is filed).

 That we find the Speedy Trial Act to be inapplicable, however, does not dispose of this issue entirely. Gallo claims that he was denied his due process and effective assistance of counsel rights by the denial of a continuance.

The denial of a motion for a continuance will not be reversed absent a clear abuse of discretion. Denial amounts to a constitutional violation only if there is an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay." To demonstrate reversible error, the defendant must show that the denial resulted in actual prejudice to his defense.

*United States v. Mitchell*, 744 F.2d 701, 704 (9th Cir.1984). *See also United States v. Faymore*, 736 F.2d 328 (6th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). The trial judge allowed Gallo only ten or eleven days to prepare a defense to the RICO claim contained in the superseding indictment. We note that granting Gallo's continuance motion would not have jeopardized the government's case against any of the defendants under the 70-day requirement of the Speedy Trial Act, 18 U.S.C. § 3161(c)(1), contrary to the government's argument, because the tolling provisions of sections 3161(h)(7) and (8)

---

**30.** The terms "indictment," "information," and "complaint" are not synonymous. An "indictment" is a grand jury accusation that a defendant committed a crime. *See* 21 Words and Phrases, *Indictment* 316–333 (1960 & 1984 Supp.). An "information" is an attorney general's or prosecuting attorney's accusation. *See* 21 Words and Phrases, *Information* 610–24 (1960 & 1984 Supp.). And a "complaint" is an accusation filed by a private person or informant. *See* 8 Words and Phrases, *Complaint* 382–85 (1951 & 1984 Supp.).

A review of the rather scanty legislative history behind § 3161(d) provides some insight into the Congress' choice of language:

If a defendant procures dismissal of an indictment or information, any subsequent indictment or information with respect to that crime and defendant must observe the requirements of subsection (b) and (c).

1974 U.S.Code Cong. and Admin.News, Committee Report on H.R. 17409 at 7401, 7453. Thus,

subsection (d) refers not to the 30 day minimum, but rather to the 70-day maximum. The language limits this recalculation of the 70-day period only to those situations in which a party other than the government procures the dismissal so that the government cannot avoid the 70-day period merely by dismissing the original indictment and subsequently obtaining a new indictment. We therefore disagree with the Ninth Circuit, which in *United States v. Harris*, 724 F.2d 1452, 1455 (9th Cir.1984), held that under the Speedy Trial Act a court may not compel a defendant to go to trial until 30 days after the filing of a superseding indictment. We note that the Supreme Court has granted certiorari in a similar Ninth Circuit case, *United States v. Rojas-Contreras*, 730 F.2d 771 (9th Cir. 1984), *cert. granted*, —— U.S. ——, 105 S.Ct. 1167, 84 L.Ed.2d 319 (1985), in which the Ninth Circuit followed *Harris*.

of that Act would cure any problems with respect to this 70-day requirement. When defense counsel makes reasonable requests for a continuance in a highly complex case, and is afforded only ten days following arraignment to prepare for trial, the trial judge's denial of the motion constitutes an abuse of discretion and violates the defendant's sixth amendment right to counsel. *Linton v. Perini,* 656 F.2d 207 (6th Cir. 1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982); *see also United States v. Wirsing,* 719 F.2d 859 (6th Cir.1983). We find the situation in these cases to be analogous to Gallo's charge under the RICO count, a complex charge with a prompt request for a continuance and an otherwise unreasonably short time to prepare a defense. We conclude that Gallo has shown prejudice with respect to the RICO charge, and we therefore reverse his conviction on that count.

Given the four months which Gallo's defense counsel had to prepare for the remaining counts in the indictment, however, we find no "spill over" effect from the continuance denial which would taint the remainder of Gallo's convictions. *See United States v. Wirsing,* 719 F.2d 859 (6th Cir.1983). There is no demonstrated prejudice in the government's proceeding to prompt trial on the other charges set out in the original indictment. Since Gallo received a concurrent and longer sentence on the count 2 conviction, the concurrent sentence doctrine preserves Gallo's conviction and sentence on this and the other counts notwithstanding our reversal of his count 1 conviction. *Barnes v. United States,* 412 U.S. 837, 848 n. 16, 93 S.Ct. 2357, 2364 n. 16, 37 L.Ed.2d 380 (1973); *United States v. Greer,* 588 F.2d 1151, 1154 (6th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979); *United States v. Grunsfeld,* 558 F.2d 1231, 1242 (6th Cir.), *cert. denied,* 434 U.S. 872, 98 S.Ct. 219, 54 L.Ed.2d 152 (1977); *United States v. Burkhart,* 529 F.2d 168, 169 (6th Cir.1976); *see also Benton v. Maryland,* 395 U.S. 784, 89

S.Ct. 2056, 23 L.Ed.2d 707 (1969). We therefore do not find it necessary to remand this case to the district court, despite our setting aside Gallo's RICO conviction.

### 2. *Hans Graewe*

 Hans Graewe also claims violation of due process and effective assistance of counsel right stemming from the trial judge's denial of a continuance following the filing of the superseding indictment. The superseding indictment, however, only affected Hans by eliminating the predicate offense of Ted Waite's murder.

As set out in our discussion of Gallo's similar claim, the Speedy Trial Act does not mandate a 30-day delay between the filing of a superseding indictment and commencement of trial. Unlike Gallo's situation, however, we find no abuse of discretion by the trial judge in denying a continuance to Hans. We believe that the judge properly exercised his discretion in refusing to grant a continuance. *See Morris v. Slappy,* 461 U.S. 1, 7, 103 S.Ct. 1610, 1614, 75 L.Ed.2d 610 (1983) ("broad discretion must be granted trial courts on matters of continuances"). Hans' counsel had almost four months to prepare for the counts contained in the original indictment, with a major predicate offense eliminated in the superseding indictment.[31] Graewe, furthermore, fails to demonstrate any "actual prejudice to his defense" caused by the trial judge's refusal to grant a continuance.

### 3. *Angelo Lonardo, Fritz Graewe, and Kevin McTaggart*

For the reasons already given, we find the trial judge to have acted well within his broad discretion in denying the motions of other appellants for a continuance.

### C. SEVERANCE

 Denial of a Rule 14 severance will not be disturbed on review unless the district court abused its discretion in deny-

---

**31.** Hans' counsel's claim is unpersuasive that the superseding indictment "changed the thrust of the prosecution from an essentially drug trafficking prosecution to a murder permeated prosecution."

ing the motion. *See, e.g., United States v. Williams,* 711 F.2d 748, 750 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 433, 78 L.Ed.2d 365 (1983); *United States v. Warner,* 690 F.2d 545, 552 (6th Cir.1982); *United States v. Tarnowski,* 583 F.2d 903 (6th Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979); *United States v. McLaurin,* 557 F.2d 1064 (5th Cir.1977).

To show abuse of discretion in this respect, a defendant must make a strong showing of prejudice. *Williams,* 711 F.2d at 751; *United States v. Davis,* 707 F.2d 880, 883 (6th Cir.1983); *Warner,* 690 F.2d at 552. Specifically, he must show an inability by the jury to separate and to treat distinctively evidence that is relevant to each particular defendant on trial. *See Williams,* 711 F.2d at 751; *Davis,* 707 F.2d at 883; *McLaurin,* 557 F.2d at 1075. Even if defendant may establish some potential jury confusion, this must be balanced against society's need for speedy and efficient trials. *United States v. Scaife,* 749 F.2d 338 (6th Cir.1984); *Davis,* 707 F.2d at 883. Persons jointly indicted normally should be tried together. *United States v. Stull,* 743 F.2d 439 (6th Cir.1984); *United States v. Licavoli,* 725 F.2d 1040, 1051 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *United States v. Dye,* 508 F.2d 1226, 1236 (6th Cir.1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *see also United States v. Robinson,* 707 F.2d 872, 879 (6th Cir. 1983).

**1. *Angelo Lonardo***

Lonardo claims the district court erred by failing to grant his motion for severance. *See* Fed.R.Crim.Proc. 14. This claim raises an issue concerning the effect the court's actions had on the ability of the jury to decide fairly and separately the guilt or innocence of each defendant.

▬▬▬ Lonardo claims that the "mass of highly inflammatory testimony concerning the gruesome and brutal murders [charged against the other defendants] would not have been admitted if Appellant were tried alone" (Lonardo's brief at 25). He argues that he has a right not to be tried for violent offenses for which he is not charged, not to be tried jointly with appellants charged in a similar but allegedly unrelated conspiracy, and not to be tried in a joint trial where substantial prejudice results from a "spillover effect" of evidence relating to other appellants.[32]

Lonardo fails to support his argument for severance with any showing of likely jury confusion or other indicia of prejudice. Rather, he bases his argument on the inflammatory nature of some of the evidence adduced against the other appellants. Merely because inflammatory evidence is admitted against one defendant, not directly involving another codefendant (and with which the other is not charged) does not, in and of itself, show substantial prejudice in the latter's trial. *See United States v. Scaife,* 749 F.2d 338 (6th Cir.1984), in which this court found no abuse of discretion

---

**32.** The arguments raised by Lonardo in his severance claim are intimately related to his contention that some of the evidence, especially that relating to the murders, should have been excluded under Rule 403 of the Federal Rules of Evidence. Indeed, the Rule permits a judge to exclude evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

For essentially the reasons we give for not finding improper the denial of Lonardo's Rule 14 motion, we find no abuse of discretion by the trial court in refusing to exclude the evidence on Rule 403 grounds. Clearly in reviewing Rule 403 decisions we must apply an "abuse of discretion" standard. *See e.g., United States v.*

*Friedland,* 660 F.2d 919, 929 (3d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982); *United States v. Authement,* 607 F.2d 1129, 1131 (5th Cir.1979); *United States v. Larios,* 640 F.2d 938, 941 (9th Cir.1981); *United States v. Pomerantz,* 683 F.2d 352 (11th Cir. 1982); *accord United States v. Jenkins,* 525 F.2d 819, 824 (6th Cir.1975). Given the frequently violent nature of crimes committed in furtherance of the illicit activities Congress addressed in its enactment of the RICO and CCE statutes, we do not find an abuse of discretion by the trial court in refusing to exclude under Rule 403 evidence of those violent crimes committed by Lonardo's co-conspirators in furtherance of the CCE.

even though evidence of one defendant's attempted murder of an FBI agent was admitted during a joint trial for robbery and even though the other defendants were not charged with the attempt.

Here, the jury was able to acquit each appellant on some counts and convict them on others. This strongly suggests that the jury was not confused by the testimony adduced at trial, and was able to attribute to each appellant evidence pertinent to that particular party. Absent a clear showing of specific and compelling prejudice resulting from a joint trial, the denial of a motion for severance will not serve as a basis for reversal. *See United States v. Dempsey,* 733 F.2d 392, 398 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984); *United States v. Licavoli,* 725 F.2d 1040, 1051 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); *United States v. Williams,* 711 F.2d 748, 751 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 433, 78 L.Ed.2d 365 (1983); *United States v. Hamilton,* 689 F.2d 1262, 1275 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). Lonardo has failed to make the strong showing required.

 Lonardo further claims that the district court's refusal to sever his trial resulted in a "spillover effect" which may have caused the jury to convict him "not on the basis of evidence relating to [him] but by imputing to [him] guilt based on the activities of the other set of conspirators." *United States v. Tolliver,* 541 F.2d 958, 962 (2d Cir.1976).

> The existence of ... a "spill-over" or "guilt transference" effect ... turns in part on whether the numbers of conspiracies and conspirators involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him to which he was entitled.

> \*　　\*　　\*　　\*　　\*　　\*

Nine persons here were indicted, and six went to trial, virtually the same number we found insufficient in *United States v. Miley,* 513 F.2d 1191, 1209 (2d Cir.

1975), to raise a possibility of guilt transference, and far fewer than the 29 persons indicted and 17 tried in *United States v. Bertolotti,* 529 F.2d 149, 156 (2d Cir.1975), or the 32 defendants indicted and 19 tried in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), where a "spill-over" effect was found to exist.

541 F.2d at 962–63. In comparison to *Tolliver* this case involves seven indicted defendants, only five being tried. The authority cited is not a basis for reversal on the "spillover" effect of failure to sever.

Joinder of cases is permitted when it would promote judicial economy without substantial prejudice to the defendants. Fed.R.Crim.P. 8; *Bruton v. United States,* 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620, 1625 n. 6, 20 L.Ed.2d 476 (1968). A defendant has no right to a separate trial merely because his likelihood of acquittal would be greater if severance were granted. *United States v. Stirling,* 571 F.2d 708, 733 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978); *United States v. Larson,* 526 F.2d 256, 260 (5th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976). Absent a showing of substantial prejudice, spillover of evidence from one case to another does not require severance. *United States v. Ricco,* 549 F.2d 264, 270–71 (2d Cir.1977). The burden is upon Lonardo, who has failed to show this substantial prejudice required for reversal.

Lonardo cites *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), to support his contention in this respect, a case involving a serious variance between the indictment charge and the proof adduced by the government. In *Kotteakos* there were eight different conspiracies linked by a single broker at its hub: "the pattern was 'that of separate spokes meeting in a common center,' though ... without the rim of the wheel to enclose the spokes." *Id.* at 755, 66 S.Ct. at 1243. The indictment, however, had charged only one conspiracy, and the trial judge had instructed the jury "It is one conspiracy, and the question is whether or

not each of the defendants, or which of the defendants, are members of that conspiracy." *Id.* at 756, 66 S.Ct. at 1243. The indictment in the instant case does not charge Lonardo with the RICO conspiracy; rather, Lonardo is charged with complicity in a separate CCE conspiracy. The indictment charge, unlike the situation in *Kotteakos*, is not at variance with the government's proof.[33] Thus, *Kotteakos* is inapposite.

Lonardo also relies on *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), which again involved a joint trial of defendants in a spoke and hub type conspiracy, a scheme to transport stolen goods in interstate commerce. Three separate groups were involved with a common coordinator to transport stolen goods to various states. The conspiracy charges linking the *Schaffer* appellants with the common coordinator were *dropped,* yet the Court found joinder appropriate. In contrast, the conspiracy charge against Lonardo was not dropped, and the proof against the other defendants in the CCE charge were applicable to Lonardo. *Schaffer* is clearly distinguishable.

*United States v. Reynolds,* 489 F.2d 4 (6th Cir.1973), *cert. denied,* 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974), and *United States v. Bova,* 493 F.2d 33 (5th Cir.1974), also cited by Lonardo, deal with a Rule 8(b) misjoinder claim. Lonardo, however, did not claim a Rule 8(b) misjoinder in the proceedings below, and therefore he has failed to preserve this claim on appeal. *United States v. Williams,* 711 F.2d 748, 750 & n. 3 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 433, 78 L.Ed.2d 365 (1983).

*United States v. McLaurin,* 557 F.2d 1064 (5th Cir.1977), involved a trial of 15 defendants together, with common names and nicknames, and still the court found no abuse of discretion in denying a severance. "Defendant's burden of showing prejudice [is] a 'heavy' or 'extremely difficult' burden." *Id.* at 1075. Likewise, *United States v. Tarnowski,* 583 F.2d 903 (6th Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979), cited by Lonardo, involved a finding of no abuse of discretion in denying a Rule 14 severance motion.

In *United States v. Vinson,* 606 F.2d 149 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), the defendants presented a more compelling case of prejudice than in the instant case. The defendants claimed that they were antagonistic toward one another. The court found severance unnecessary "[a]bsent some indication that the antagonism between [them] misled or confused the jury." *Id.* at 154. The court noted "the mere fact that codefendants attempt to blame each other does not compel severance." *Id. United States v. Kendricks,* 623 F.2d 1165, 1168 (6th Cir.1980) (per curiam), in like fashion held "defendant must show that antagonism between codefendants will mislead or confuse the jury." (One defendant was charged with a crime that the others were not.) There was, nevertheless, no abuse of discretion in denial of a Rule 14 severance. There was no claim of antagonism between the positions of co-defendants in this case.

Finally, *United States v. Ong,* 541 F.2d 331 (2d Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977), cited by Lonardo, stands for the proposition that the harmless error rule applies in situations when a separate trial should have been granted to avoid the potential of undue prejudice. We find that no undue prejudice was demonstrated by the district court's denial of the Rule 14 severance in the instant case, and conclude that none of the authority cited by Lonardo persuades us to the contrary.

### 2. *Fritz Graewe*

Fritz Graewe, unlike Lonardo, was charged in the RICO conspiracy (count 1). He makes a similar argument to that of

---

**33.** See also *United States v. Bertollotti,* 529 F.2d 149 (2d Cir.1975), for a similar factual situation to that in *Kotteakos.*

Lonardo's for new trial based on a failure to sever, because he claims his joinder in count one was made in bad faith and because the district court granted his Rule 29(a) motion for acquittal on the RICO count.

We find no indicia of bad faith in the government's decision to join Fritz in the RICO conspiracy count. The evidence at the very least suggests that Fritz was an accessory after the fact in a number of murders that served as predicate acts for the RICO count.[34] Under the circumstances, we are not persuaded that the government acted in bad faith in charging him along with other defendants in count 1.

We conclude that Fritz Graewe states a less persuasive case for severance than does Lonardo, and for essentially the same reasons stated in denying Lonardo's claim, the trial judge did not abuse his discretion in denial of severance despite the favorable Rule 29 holding.

## D. RULE 105 LIMITING INSTRUCTIONS

■■■ Both Lonardo and Fritz claim error in the failure to give Rule 105[35] limiting instructions with respect to certain testimony, which the court admitted, they assert, for purposes of proving the RICO charge not the CCE charge. The government contends that the court's three or four admonitions each day to the jury, directing that jurors consider the evidence separately as to each defendant was sufficiently limiting. In any event, the government contends the evidence was admissible to prove the CCE as well as the RICO charge.

■■■ Assuming that the court's general instructions wer not the specific mandate required by Rule 105, see *Lubbock Feed Lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250, 266 (5th Cir.1980); and Wright and Graham, 21 *Federal Practice & Procedure* § 5062 (1977 & 1983 Supp.), we consider the alternate argument of the government that Rule 105 instructions are not required if the evidence is relevant, material, and otherwise admissible without limitation against the party requesting the instruction. If certain evidence is admissible against one defendant on one particular count, and the primary purpose of the presentation is to prove that count, a court need not give Rule 105 instructions requested by a co-defendant if the evidence is also admissible against the latter as to a completely different count. The trial judge correctly noted that the evidence in controversy here

> may come in to establish an overt act as to the [RICO] conspiracy count [and] it may come in to indicate the in concert relationship with others and [to show] that the enterprise was a continuing enterprise.

Evidence of Lonardo's *supervisory* position over Gallo and Sinito, developed by the government in its proof on the RICO count was also relevant to Lonardo's similar role in the CCE.[36] For the same reasons we

---

**34.** RICO defines racketeering activity, *inter alia,* as "an act or threat involving murder ... which is chargeable under state law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961. Under Ohio Rev.Code §§ 2921.-32(A) and (B), and 2929.11(B), obstruction of justice is punishable by imprisonment for more than one year. Courts have found obstruction of law enforcement activities concerning listed predicate acts to be predicate acts themselves, we similarly find obstruction of justice concerning predicate acts also to be predicate acts. *See United States v. Welch,* 656 F.2d 1039 (5th Cir. 1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982).

**35.** Rule 105 of the Federal Rules of Evidence provides:

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

**36.** We specifically reject Lonardo's contention that evidence presented relative to a co-defendant's purported involvement in a "RICO" conspiracy cannot be used to support a conviction of the other defendant's involvement as charged in a "continuing criminal enterprise." Although the two offenses have separate elements of proof, often a substantial overlap in the evidence offered may exist. *Cf. United States v. Phillips,* 664 F.2d 971, 1038 (5th Cir.1981).

reject Fritz's complaints about the court's failure to give Rule 105 limiting instructions in respect to his involvement in activities with which other defendants were charged.

### E. ABSENCE AT TRIAL

After the government had rested its case, appellant Hans Graewe became ill and was taken to a local hospital. His attorney was about to conclude his case, and ·the other defendants about to begin their presentations. Hans was absent for no more than two days. The following colloquy took place between the court and Hans' defense attorney when he first failed to attend the trial:

THE COURT: Let the record show earlier this morning the Court was called by the Marshal and told that Mr. Hartmut Graewe was at the City Hospital and was admitted there last night as an emergency patient.

His counsel this morning was told of the call and has talked to Mr. Graewe by phone at the Hospital....

[DEFENSE COUNSEL]: I have talked with Mr. Graewe at the hospital.

His indication to me is he is prepared at this time to enter a waiver of his presence of the continuing cross-examination of Agent Winslow that I will be conducting.

At this point I will be resting our case, and he has waived his presence in the preparation of the other defendants' cases.

THE COURT: Let the record so show.

[PROSECUTOR]: Your Honor, I move for leave of the Court to reopen the Government's case to call Detective Phil Smith.

THE COURT: The motion is granted.

[DEFENSE COUNSEL]: Let our objection be noted.

After Graewe returned to court he again became ill and requested permission to absent himself for an additional day. At this point, the following colloquy took place in the judge's chambers:

[DEFENSE COUNSEL]: Hartmut Graewe would at this time waive his presence during the rebuttal testimony for the day in order to recuperate and be better prepared to sit for the rest of the trial, specifically closing argument and those type of things. It is his wish that this waiver be accepted and that he be returned to the—do you want to go back to the medical facility at the jail?

DEFENDANT HARTMUT GRAEWE: Yeah.

[DEFENSE COUNSEL]: He would like to go back to the medical facility at the jail, at County Jail.

THE COURT: Is this your decision, Mr. Graewe?

DEFENDANT HARTMUT GRAEWE: Pardon me?

THE COURT: Is this your decision, sir?

DEFENDANT HARTMUT GRAEWE: Yes, sir.

THE COURT: The Court will grant you the motion....

Jt.App. at 2972.

It is well settled that a defendant can waive his right to be present at trial by voluntarily absenting himself from trial, *see Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973), by obtaining the court's permission to be absent, *see United States v. Jones*, 514 F.2d 1331 (D.C.Cir.1975), or by failing to make a timely objection to the holding of proceedings in his absence, *see United States v. Brown*, 571 F.2d 980, 987 (6th Cir.1978). Here is demonstrated a clear example of waiver. We find Hans' argument in this regard entirely baseless. There is no showing of prejudice.

### F. OFF THE RECORD CONFERENCES

Numerous times during trial the district judge engaged in dialogue with the attorneys, both for defendants and for the government, "off the record," but usually out of the jury's hearing.[37] These off-the-

---

**37.** We note that during the five day period of

jury deliberations the judge also made "off the

record remarks were not transcribed.[38] There is no indication that during the trial any attorney objected to this procedure. To the contrary, when defense attorneys objected to a ruling resulting from off-record discussion, the court permitted the attorneys to go "on record" to state their objections in full.[39] We consider the court's failure to record fully these bench conferences sufficiently troublesome to merit full discussion.

The Court Reporters Act, 28 U.S.C. § 753, states in part:

(b) One of the reporters appointed for each such court shall attend at each session of the court and at every other proceeding designated by rule or order of the court or by one of the judges, and *shall record verbatim* by shorthand or by mechanical means which may be augmented by electronic sound recording subject to regulations promulgated by the Judicial Conference: (1) *all proceedings in criminal cases had in open court;* (2) all proceedings in other cases had in open court unless the parties with the approval of the judge shall agree specifically to the contrary; and (3) such other other proceedings as a judge of the court may direct or as may be required *by rule or order of court* or as may be requested by any party to the proceeding.

(Emphasis added). We agree that the Act states a mandatory rule. *See United States v. Renton,* 700 F.2d 154 (5th Cir. 1983); *United States v. Selva,* 559 F.2d 1303, 1305 (5th Cir.1977); *United States v. Garner,* 581 F.2d 481 (5th Cir.1978). Fur-

thermore, it is the duty of the court, *not* the attorneys, to meet the Act's requirements. *United States v. Garner,* 581 F.2d 481 (5th Cir.1978).

A violation of the recording mandate, however, is not *per se* error, and thus without more does not require reversal. Even the Fifth Circuit's *United States v. Selva,* 559 F.2d 1303 (5th Cir.1977), which most strictly views failure to follow the Act's requirements, does not adopt a *per se* error approach. Rather, *Selva* states two different standards depending on whether the same counsel represented defendant at trial and on appeal. If the counsel is the same, *Selva* requires an appellant to show hardship and prejudice before a court will find reversible error. A standard less exacting upon defendant applies if appellate counsel were not the trial counsel. In such situations, according to *Selva,* a defendant need only show the absence of "a substantial and significant portion of the record." *See also United States v. Renton,* 700 F.2d 154 (5th Cir.1983).

In some instances the failure of a court to follow the § 753(b) mandate will require reversal. We disagree, however, that a separate, less demanding test need be applied when a defendant is represented by new counsel on appeal. Absent a showing by counsel on appeal of a reasonable but unsuccessful effort to determine the substance of the off-the-record remarks and the nature of a claimed error, reversal is not an appropriate remedy. In any event, we refuse to apply two standards in reviewing § 753(b) problems when it happens

record" remarks to the jury on three occasions. It appears, however, that these comments concerned the jury's physical comfort, and on one occasion a juror's need to visit her dentist. These remarks, no matter how innocuous, should be made on the record, but we find the error to be harmless under the circumstances beyond a reasonable doubt.

**38.** At oral argument neither side was able to answer whether audio recordings of these discussions were made by the court. For purposes of this appeal we will assume the "off-the-record" dialogues are not now available in any form.

**39.** The following colloquy is representative of this situation:

[DEFENSE COUNSEL]: Object, your Honor.
THE COURT: Approach the Bench.
(The following proceedings were had at the side bar out of the hearing of the jury.)
(Discussion had off the record.)
THE COURT: All right. Put whatever you want on the record.
[DEFENSE COUNSEL]: Your Honor, I rise to object because....

Jt.App. 1951. (No objection was made to the fact that the discussion was not then made a part of the trial record.)

that trial counsel and appellate counsel are not the same.[40]

In determining whether hardship or prejudice results from a trial court's failure to record every statement made in "open court," the reviewing court must consider all the circumstances in the record surrounding the omission. Generally, failure to record comments made by the judge or counsel to the jury will be viewed with greater disfavor than those made during side bar discussions. *See United States v. Sneed*, 527 F.2d 590 (4th Cir.1975); *United States v. Piascik*, 559 F.2d 545, 548 (9th Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). A court's offer to counsel to record objections following an "off-the-record" discussion lessens the risk of prejudice and reversal.[41] *See, e.g. United States v. Metz*, 608 F.2d 147 (5th Cir.1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980); *United States v. Sneed*, 527 F.2d 590 (4th Cir.1975). Compare these with the situation in *United States v. Weiner*, 578 F.2d 757 (9th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978).[42]

■ It is significant that defendants may have waived objections to the court's procedure, even if it failed to comply with the Court Reporters Act above cited. The

defendant's personal consent or a waiver of claim of error in not recording all proceedings may preclude claims of reversible error. *See United States v. Weiner*, 578 F.2d 757, 789 (9th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978); *United States v. Piascik*, 559 F.2d 545, 549–50 (9th Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); *Houston v. United States*, 419 F.2d 30, 34 (5th Cir.1969). Lawyers for defendants in this instance went beyond merely acquiescing in the trial court's procedure; in a number of instances, the directive to "go off the record" came not from the court but from defendant's counsel, without objection from other counsel.[43] We find defendants effectively to have waived objection to the "off-the-record" side bar discussions especially in light of their failure to state any particular substantive errors the court may have made during these discussions. *See United States v. Long*, 419 F.2d 91, 94 (5th Cir.1969) ("in order to require reversal, some specific error or prejudice resulting from failure to record such proceedings must be called to the Court's attention").

■ With respect to this issue, however, under our supervisory power we strongly "suggest that if the trial court

**40.** To apply a different standard as a matter of course may invite counsel to plant the seeds of reversible error during the course of trial, and permit a resourceful defendant to reap the benefit by utilizing a different counsel on appeal. As the Fifth Circuit itself noted in *United States v. Smith*, 591 F.2d 1105, 1109 n. 1 (5th Cir.1979):

This anomalous [*Selva* ] rule seems to invite the manipulation of appellate causes to achieve unmerited reversals.

We do not, however, imply that appellant or his counsel in the instant case engaged in any such improper manipulation.

**41.** Appellant's counsel argues that some of the recorded objections are so ambiguous and confused that "[t]he realm of speculation reaches mind boggling heights in attempting to divine what procedural matters were discussed, who discussed them, what was said or represented by the parties to this lawsuit, what was said by the court, and what rulings were made." Gallo's and McTaggart's brief at 33.

Our own review of the record, on the other hand, indicates that in most instances the nature and outcome of the off-the-record discus-

sions are clear. The trial judge permitted defense counsel to record objections to his rulings. It is counsel's responsibility to ensure that the record is clear and complete. We find no reversible error in those few instances in which the nature of defendants' objection is not clear, especially absent allegations of the nature of errors the court is claimed to have committed.

**42.** Appellants do claim that at one point during *voir dire,* Gallo's attorney stated he would like a particular motion made part of the record and the judge replied "[i]t is not necessary for the record." This motion was not demonstrated to involve a prejudicial matter. Thus, although we view the court's refusal to permit the motion to be made part of the record with disfavor, we find this particular instance to be harmless error also.

**43.** We are not impressed by appellants' claim that they were "brain washed" into accepting the court's procedure here.

needs to confer with counsel about rulings to be made from the bench the safe course is to excuse the jury or retire to chambers and let the reporter record what takes place." *United States v. Brumley,* 560 F.2d 1268, 1281 (5th Cir.1977). On the record before us, however, reversible error has not been demonstrated by the unfortunate failure to record all proceedings in the court pertaining to the trial.

## G. STEERING

■ Appellants filed motions for new trial claiming that by manipulating the court assignment system the prosecutors had engaged in a pattern of "steering" significant criminal cases to a judge of their choice. We note that in an analogous and related case we held that due process concerns are not implicated by clerical errors resulting in a defendant's being assigned to a different judge than he would have received absent the error. *Sinito v. United States,* 750 F.2d 512 (6th Cir.1984). In *Sinito,* the court noted that "a defendant does not have a right to have his case heard by a particular judge," does not "have the right to have his judge selected by a random draw," and "is not denied due process as a result of the error unless he can point to some resulting prejudice." *Id.* at 515.

> [E]ven if control over the assignment of cases were not observed by the court under the rule, the judges have inherent power to administer the business of the courts in an orderly way. Litigants have no vested right in the order in which cases are assigned for trial; and it is not contended that the judge to whom the case was assigned was in any way disqualified.

*Levine v. United States,* 182 F.2d 556, 559 (8th Cir.1950), *cert. denied,* 340 U.S. 921, 71 S.Ct. 352, 95 L.Ed. 665 (1951).

These cases are clearly dispositive. Appellants do not claim the trial judge was in any way disqualified to hear the case. The district court properly refused to grant appellant's motion for new trial based on this claim.

## III. CONCLUSIONS

We have carefully considered the remainder of appellants' numerous arguments and find them to be without merit.

For the above reasons we AFFIRM in full the convictions of appellants Angelo Lonardo, Hartmut Graewe, Frederick Graewe, and Kevin McTaggart. We AFFIRM Joseph Gallo's conviction except that we REVERSE his conviction on count 1 because of the court's failure to accord him sufficient time in which to prepare his defense. Because Gallo's sentence on count 1 was to run concurrently with the longer sentence he received on the remaining counts, however, we do not find it necessary to remand the case to the district court for further proceedings.

Accordingly, we AFFIRM in part and REVERSE in part.