902 F.2d 35
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sonny James JONES and Wallace V. McDaniel, Defendants-Appellants.
 Nos. 89-5504, 89-5522.
 United States Court of Appeals, Sixth Circuit.
 April 24, 1990.
 
 PER CURIAM:
 
 
 1
 Defendants Sonny James Jones and Wallace V. McDaniel appeal their convictions for bank robbery, conspiracy, and related gun charges. They claim: (1) the District Court improperly refused to sever their trials; (2) the District Court should have granted their motions for acquittal because the evidence against them was insufficient; and (3) juror misconduct prejudiced their rights to a fair trial. Additionally, McDaniel alleges that the District Court improperly refused to sever the charges against him related to possession of a firearm by a convicted felon. We find that the District Court did not abuse its discretion in refusing to sever the defendants and sever the counts against McDaniel, that the evidence against the defendants was sufficient, and that juror misconduct did not prejudice the defendants' rights to a fair trial. Accordingly, we AFFIRM.
 
 I.
 
 2
 Jones and McDaniel were both convicted of conspiracy to rob a bank, in violation of 18 U.S.C. Sec. 371 (Count I), bank robbery, in violation of 18 U.S.C. Secs. 2113(a) and (d) (Count II), and possession of a firearm during the commission of a violent crime, in violation of 18 U.S.C. Sec. 924(c)(1) (Count III). McDaniel was additionally charged with two counts of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. app. Sec. 1202(a)(1). These two counts were for his possession of firearms on the day of the robbery (Count IV) and the day of his arrest in August 1986 (Count V).
 
 
 3
 On Friday, August 23, 1985, at approximately 9:25 a.m., two masked persons robbed the People's Exchange Bank of Beattyville, Kentucky, of more than $40,000. The first robber, who the prosecution contended was Jones, was wearing a Halloween mask and was armed with a dark colored pistol. He went behind the teller line to collect the cash while the second robber, who the prosecution contended was McDaniel, stood watch in the lobby area. The second robber, who was also carrying a pistol, was described as having a large, distinctive nose, though much of his head and face was apparently obscured by a bandanna and hood.
 
 
 4
 The robbery itself took approximately five minutes. The first robber then got into the passenger side of a pick-up truck waiting outside; the second robber climbed into the back. The truck was driven by a unknown third person who has not been identified by law enforcement officials, though a bank employee described him as a clean-shaven white male with dark brown or black hair. It is also possible that the driver of the vehicle was Jones and that it is the first robber who remains unidentified.
 
 
 5
 As the robbers sped from town, Truman Congleton, Jr. and his brother, informed of the robbery by a bank employee, followed them. The robbers eventually noticed that they were being followed. The robber in the back of the pick-up truck fired several shots at the Congletons, ultimately disabling Congleton's vehicle with a shot fired from his pistol. The bullet was later recovered from the tire for ballistics testing. Shortly after disabling the vehicle, the robbers' pick-up almost collided with a telephone company vehicle driven by Richard Adams. Adams subsequently selected a photograph of Sonny James Jones as looking like the person he thought was the driver of the truck, but was unable to say with certainty anything more than that Jones had the "general features" of the driver. Adams' testimony weakens the government's claim that Jones was the first robber who entered the bank.
 
 
 6
 The pick-up truck used for the getaway proved to have been stolen from Irvine, Kentucky, some time the night before the robbery. The robbers ultimately abandoned it in Heidelburg, Kentucky. A police officer and bank officials followed the robbers' tracks from the truck to a set of nearby railroad tracks and then along the tracks for several miles in the direction of Irvine, which was approximately 25 miles away by rail. The tracks were bounded by the Kentucky River on the left and by rocky, mountainous country on the right. Irvine was apparently the first town located along the tracks in the direction the robbers were heading.
 
 
 7
 On Saturday, August 24, 1985--the day after the robbery--shortly before 9:30 a.m., McDaniel entered the Preston Supply Store which was located near the railroad tracks in Irvine. He was overheard making a collect call and stating that he would be at Ollie's. McDaniel's home phone records showed that a collect call was made from this phone to his home phone at 9:29 a.m.
 
 
 8
 McDaniel then went next-door to a Kentucky Fried Chicken restaurant where he ate and apparently was seen carrying on a conversation with another person seated in a booth behind him. McDaniel then took a cab to the Calloway Creek area outside of Irvine. The cab driver testified that McDaniel appeared nervous and occasionally peered over his shoulder. McDaniel told the driver that he was from the Jackson County area and that he had just had a fight with his girlfriend who worked in the Kentucky Fried Chicken restaurant. McDaniel is married and does not live in Jackson County. The restaurant employees testified that no fight had occurred that morning and that none of them knew McDaniel.
 
 
 9
 Ollie Kilburn, an acquaintance of McDaniel, testified that McDaniel appeared at his residence on a Saturday in 1985, though he could not recall the exact date. Kilburn found this unusual since McDaniel had before this time always stopped by during the week, never on weekends. Kilburn testified that the visit was also unusual in that McDaniel asked to use Kilburn's telephone. Telephone records indicate that on Saturday, August 24 at 12:24 p.m., a phone call was made from Kilburn's residence to McDaniel's residence. Kilburn did not remember placing that or any other call to McDaniel's residence. Shortly after the call, McDaniel's son, Todd, and another person Kilburn did not know picked up McDaniel. Kilburn testified that McDaniel's other son, James, did not accompany them. This testimony contradicted the story McDaniel later told police. James Hoskins, a friend of Todd's, testified that he had been the second person who picked up McDaniel that day.
 
 
 10
 On that same Saturday, the day after the robbery and some time after McDaniel left the Kentucky Fried Chicken restaurant, Jones entered the restaurant and asked employees if they had seen a certain individual. The description Jones gave fit the person whom the employees had seen talking with McDaniel earlier in the day. After the employees stated that the person had been there and left, Jones then asked to use the telephone to place a long distance call. Eventually, Tim Wiseman, whose wife worked in the store, agreed to take Jones to his parents' house so that Jones could use the phone there. Telephone records indicate that a phone call was made from Wiseman's parents' home to Jones' mother's residence in Manchester, Kentucky, at 12:40 p.m. that day. Wiseman overheard Jones ask if someone could pick him up in Irvine. When Jones had difficulty arranging a ride, Wiseman agreed to drive him home.
 
 
 11
 Wiseman struck up a conversation with Jones during the drive. Jones explained that for the last two days he had been hunting a few miles out of town with two friends. His car had broken down near the railroad tracks and he had been forced to walk six hours along the tracks into Irvine to get to a telephone. Jones refused Wiseman's offer of help in repairing his car however. More puzzling to Wiseman was Jones' lack of concern for his two friends. When asked whether they also needed a ride, Jones showed no concern for them at all, responding that they could find their own way home. Wiseman eventually dropped Jones off at a house in Manchester that police later determined to be Jones' residence.
 
 
 12
 On Monday, August 26, 1985, bank surveillance photographs of the robbers were shown to Manchester Police Chief Dennis Rice. Chief Rice stated at the time that one of the two robbers appeared to be McDaniel, but at the trial stated that it was difficult for him to say for certain. Rice also stated that Jones was a friend of McDaniel's son James. At trial, Rice described McDaniel as a close friend from childhood and noted that the two had been friends on the Manchester Police Force until McDaniel left the force in 1980. He stated that it was difficult for him to be there testifying against McDaniel.
 
 
 13
 On August 20, 1986, more than a year after the robbery, McDaniel, his son James, and a third person were stopped by a law enforcement official in Jackson County, Kentucky. McDaniel had a rifle between his legs and two pistols on the seat beside him. All three guns were seized by the officer. McDaniel claimed to own all three guns. One of the pistols was a Smith and Wesson .357 Magnum revolver. The state police crime lab subsequently determined that the revolver had fired the bullet recovered from Congleton's truck tire a year earlier, although a ballistics expert for McDaniel contradicted this testimony.
 
 
 14
 In February 1987, McDaniel told law enforcement officials that on the day after the robbery he had been in or near Irvine. He claimed to have let his son Todd out of his truck to go hunting near Calloway Creek that morning. After his truck became stuck near Irvine, he asserts that he walked into town, had lunch, then took a cab out to Ollie Kilburn's house. Contrary to Kilburn's testimony, however, he told the law enforcement officials that his son James had picked him up and that they had pulled his car out.
 
 
 15
 McDaniel also told police that he had used the .357 Magnum when he was an officer on the police force. At that time the gun belonged to Grover Abner, another officer. McDaniel claimed to have returned the gun to Abner prior to the bank robbery. He stated the gun came back into his family's possession after the robbery when his wife purchased it for his son Todd's birthday present in early 1986. At the trial, Grover Abner confirmed that McDaniel used a Magnum while on the police force, but testified that he sold that weapon to McDaniel in the early 1970's. He denied that McDaniel ever returned the weapon to him.
 
 
 16
 In March 1987, Jones told police officials that he could have been looking for car parts in Irvine the day after the robbery. When his wife started to volunteer information to the officers, Jones instructed her not to talk.
 
 
 17
 Several bank employees testified at the trial. While no one was able to identify Jones or McDaniel with certainty, several of them stated that McDaniel--particularly his nose--resembled the second robber. Many persons had picked out his picture in a photo line-up as resembling the second robber. Several persons also testified that Jones resembled one of the robbers, though, as noted, another witness said he looked like the driver of the getaway car. The government apparently contended that Jones was the first robber who climbed into the passenger seat of the car and that the witness who described him as the driver was confused. Finally, a teller at the bank testified that she selected a picture of both Jones and McDaniel as looking familiar to her--as though they had been in the bank the week before the robbery. Neither of the defendants had accounts in the bank. It was the prosecution's contention that they were casing the bank before the robbery.
 
 
 18
 Various alibi witnesses also testified on behalf of the defendants. Jones was reportedly in Clay County, Kentucky, that morning and McDaniel was fishing on Rockcastle River. Kilburn testified, however, that McDaniel went fishing the week after McDaniel had stopped in to use his phone. He remembered that McDaniel had come by to give him some of the catch.
 
 
 19
 After the trial and conviction of the two defendants, the District Court held a hearing on two incidents of misconduct by one of the jurors, James C. Philpot. During the voir dire, Philpot failed to answer when the panel was asked whether they or any member of their family owned or had owned stock in any financial institution. Apparently Philpot's grandfather had owned stock in a bank sometime in the past and Philpot's father had owned stock in a bank up until a year or two before the trial. Philpot testified that he thought the question went to current ownership of stock. Further he believed the question was meant to determine whether it would prejudice his ability to hear the case. Philpot testified that his relatives' past stock ownership had no impact on his fairness and impartiality as a juror in the trial. The District Court found that Philpot had not deliberately concealed the stock ownership and that the ownership had not affected his judgment as a juror.
 
 
 20
 Philpot also testified that he had contact with Junior Baker, McDaniel's son-in-law, during the trial. Philpot recognized Baker when he saw him sitting behind the defense table as a person he had worked with on several contracting jobs. He did not know the relationship between McDaniel and Baker at this time. The District Court found that Baker had initiated contact with Philpot on two occasions during the trial by going to see him at his home, although Philpot thought there had been only one visit. One of the visits concerned a construction project that the two of them were bidding on. During the second visit, Baker apparently asked Philpot what he thought about the firearms ballistics testimony. Philpot testified, and the District Court found, that Philpot told Baker that they could not discuss the matter. The court also made a finding that during the visit Philpot discovered that Baker was McDaniel's son-in-law. Baker testified that he felt Philpot had attempted to solicit his aid in getting a construction project bid and had initiated the conversation about the trial. While the District Court did not make a finding on this question, the court did find that there was no proof that the contact had prejudiced the trial.
 
 II.
 
 21
 The defendants first argue that the District Court's failure to sever their trials and the failure to sever the felon in possession of a firearm counts against McDaniel was an abuse of discretion. The government first argues that the defendants have waived this argument by failing to renew their severance motions at the conclusion of the government's case or the conclusion of all the evidence. Alternatively, the government argues that the defendants have failed to show any substantial prejudice that has resulted from the joinder. Initially, we note that the defendants' failure to renew their objections is usually a bar to raising this claim on appeal. United States v. Swift, 809 F.2d 320, 323 (6th Cir.1987) (prescribing a prescriptive rule effective in future cases). While the defendants' argue that the Swift rule should not operate as a bar where the trial court has made clear the motion would be futile, we need not pass on the validity of this exception in this case since we find that the trial court did not abuse its discretion in joining the defendants or the counts.
 
 
 22
 A trial court's failure to grant a motion for severance of defendants or charges will only be overturned for an abuse of discretion. United States v. Tarnowski, 583 F.2d 903, 906 (6th Cir.1978), cert. denied, 440 U.S. 918 (1979). A defendant must make a strong showing of prejudice in order to establish an abuse of discretion. "Specifically, he must show an inability by the jury to separate and to treat distinctively evidence that is relevant to each particular defendant on trial." United States v. Gallo, 763 F.2d 1504, 1525 (6th Cir.1985), cert. denied, 474 U.S. 1068 (1986).
 
 
 23
 Both defendants claim that McDaniel's trial on Counts IV and V of the indictment should have been severed from their trial on the bank robbery charges since those counts involved proof of a prior felony committed by McDaniel. The efficiency of trying these two charges, which grew out of the same series of transactions, with the bank robbery charge is readily apparent. Proving Count IV required the government to prove that McDaniel committed the bank robbery. The only method of proving that McDaniel was one of the robbers was to submit all the evidence tending to show that McDaniel robbed the bank. While proving McDaniel's possession of the guns in Count V was considerably easier, the same proof was a key element of the government's case against McDaniel for bank robbery.
 
 
 24
 The prejudice of trying these two counts at the same trial is that the jury learned that McDaniel had earlier been convicted of receiving stolen property. Essentially, McDaniel argues that the jury could have been prejudiced against him by the knowledge of his prior conviction. Jones argues that in his case the jury could have decided that he was more likely to have committed the crimes because he associated with a criminal--though Jones fails to mention that the only proof of their association was his friendship with McDaniel's son.
 
 
 25
 While the possible prejudice could have been diminished by the government agreeing to stipulate that McDaniel was convicted of a felony, we do not believe that it was an abuse of discretion to allow the counts to be tried together even without such a stipulation. The prior conviction was for the unrelated offense of receiving stolen property. Further, the prosecution did not draw undue attention to the conviction. Finally, the jury was admonished that McDaniel's prior conviction was only to be used against McDaniel and only in relation to Counts IV and V of the indictment. Joint App. at 212. Under these facts, we are unwilling to reverse the District Court's ruling. See Breeland v. Blackburn, 786 F.2d 1239, 1241 (5th Cir.1986) (failure to sever aggravated burglary charge from charge of possession of a firearm by a convicted felon would not have warranted a reversal under federal rules); Gallo, 763 F.2d at 1525 ("[m]erely because inflammatory evidence is admitted against one defendant, not directly involving another codefendant (and with which the other is not charged) does not, in and of itself, show substantial prejudice in the latter's trial").
 
 
 26
 The defendants also argue that their two trials should have been severed. Essentially, both argue that the cases against them were weak and did not involve overlapping proof. Since the cases were weak and largely circumstantial, their argument continues, it is likely that the jury confused the cases against them. With respect to McDaniel, we find no basis for finding an abuse of discretion by the District Court. We do not believe that the cases were so complex or the details so confusing as to require a District Court to sever his trial from Jones' trial. The issue is somewhat more problematic with Jones since the bulk of the evidence in the trial went to McDaniel's guilt. Nevertheless, the District Court went to great lengths to point out to the jury that it should not consider such evidence against Jones. More importantly, it has already been established in this Circuit that "a defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him." United States v. Causey, 834 F.2d 1277, 1288 (6th Cir.1987), cert. denied, 486 U.S. 1034 (1988).
 
 III.
 
 27
 The defendants next argue that the District Court erred in denying their motions for acquittal. In reviewing the denial of a motion for acquittal we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. See, e.g., Gallo, 763 F.2d at 1518.
 
 
 28
 We need not linger on McDaniel's conviction. While he would summarize the evidence as only showing that he bore some resemblance to the bank robber, we find the evidence more compelling. Numerous witnesses testified that McDaniel bore a strong resemblance to one of the bank robbers. Further, he was present in Irvine, Kentucky, without a car the day after the robbers had abandoned their stolen truck and set out toward Irvine on foot. A reasonable jury would be justified in believing that the robbers had walked to Irvine after abandoning their stolen truck the day before. While McDaniel provided an alibi and at times attempted to explain his presence and behavior in Irvine, a jury would be justified in rejecting his explanations given the testimony of other witnesses who saw him that day. Finally, and most importantly, ballistics tests showed the pistol found in McDaniel's possession a year later was the gun fired by one of the robbers during the escape. While McDaniel presented conflicting ballistics testimony, the jury was entitled to believe the government's witness.
 
 
 29
 As the District Court acknowledged, the government's case against Jones was much weaker. While numerous witnesses testified that Jones looked familiar or bore a strong resemblance to one of the robbers, no one was able to positively identify him as the person they remembered seeing in the bank or during the escape. The crucial testimony linking Jones to the crime was his presence in Irvine the day after the crime. A jury would be justified in believing that the robbers headed to Irvine on foot along the railroad tracks some time on Friday. Jones admitted to Tim Wiseman that he had walked into Irvine along the same tracks early in the day on Saturday. While he claimed to have been on foot because his car had broken down while he was hunting with friends, he refused offers to help him repair his car and appeared unconcerned about the two friends he said were with him. Further, Jones at one point asked if employees of a restaurant had seen a person fitting the description of a person seen talking to McDaniel. Other testimony established that Jones was a friend of McDaniel's son. While Jones testified that he may have been looking for car parts in Irvine that day, this explanation directly contradicted the story he told Wiseman on the day he was in Irvine. While the evidence is largely circumstantial, we believe a reasonable jury could conclude that Jones participated in the bank robbery.
 
 
 30
 There is very little evidence that Jones actually possessed a firearm during the bank robbery. There was conflicting testimony on whether he resembled the driver of the getaway car or one of the two robbers who entered the bank. Nevertheless, Jones' conviction under 18 U.S.C. Sec. 924(c)(1) for using or carrying a firearm during a crime of violence can be affirmed under the Pinkerton doctrine, enunciated in Pinkerton v. United States, 328 U.S. 640 (1946), which makes conspirators liable for the foreseeable crimes of their coconspirators. While the District Court's charge was not as clear as it could have been, the charge did inform the jury that they could convict Jones of the weapons violation if they found: (1) McDaniel committed the offense of using or carrying a firearm during a crime of violence; (2) McDaniel did so in furtherance of the conspiracy to rob the bank; and (3) Jones was guilty of conspiring with McDaniel to rob the bank and was a member of the conspiracy at the time the bank robbery occurred. Trial Transcript, pp. 125-27; see id. at 647; see also United States v. Gironda, 758 F.2d 1201, 1212-13 (7th Cir.), cert. denied, 474 U.S. 1004 (1985); United States v. Brant, 448 F.Supp. 781 (W.D.Pa.1978). Since both defendants were convicted of bank robbery and conspiracy to rob a bank, and since McDaniel was convicted of the substantive gun charge, the verdict is supported by the evidence.
 
 IV.
 
 31
 While the defendants assert that juror Philpot engaged in deliberate concealment of his relatives' past ownership of bank stock, the District Court found that Philpot's failure to disclose the information was unintentional and understandable. Absent a credible allegation that Philpot intentionally concealed information, the defendants must prove actual bias to obtain a reversal. United States v. Howard, 752 F.2d 220, 225 (6th Cir.), cert. denied, 472 U.S. 1029 (1985), reaff'd, 770 F.2d 57, 62 (6th Cir.1985) (en banc), cert. denied, 475 U.S. 1022 (1986). Philpot testified that his relatives' past ownership of bank stock had no bearing on his impartiality. The District Judge found this testimony credible. We see no reason to overturn these findings or reverse the convictions on this basis.
 
 
 32
 The defendants also allege that Philpot's unauthorized communications during the trial with McDaniel's son-in-law prejudiced their right to a fair trial. "[T]he burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality." United States v. Pennell, 737 F.2d 521, 532 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985). If a District Court views juror assurances of impartiality to be credible, we may rely upon such assurances. Id. at 533. Accordingly, we review such findings only for abuse of discretion. Id. While the District Court in this case found that the contact occurred, that some minimal references to the case were made, and that Philpot initially failed to report these contacts, the court found Philpot's assurances of impartiality to be credible. Though the contact was regrettable and should have been reported to the court by the juror, we see no reason to overturn the trial court findings that it did not prejudice his impartiality.
 
 V.
 
 33
 Accordingly, the judgment of the District Court is AFFIRMED.
 
 
 34
 ---------------
 
 
 
 * The Honorable Avern Cohn, United States District Court for the Eastern District of Michigan, sitting by designation.